Pollock, Plaintiff in error, vs. The State, Defendant in error.

*May 15—June 5, 1908.*

*Criminal law: Homicide: Improper remarks by trial judge: Evidence: Immaterial errors: Intoxication of witness: Rebuttal: Experiments as to powder stains: Expert testimony: Instructions to jury: Degrees of homicide: Unnecessary killing.*

1. Upon a trial for murder a witness for the state was cross-examined as to his movements and the time of day when he saw the deceased two days before the homicide, and found difficulty in fixing any exact times. Upon objection to such cross-examination as irrelevant and immaterial the court said: "I don't know what it has to do with it, but I will state this for the benefit of the witness: When you cannot state positively the time, you may say it was somewhere between 1 o'clock and 5, or whatever time you may have in mind." Also, when the witness objected to stating how much money he had loaned to the deceased, the court said: "You may answer and let him know whether it was a large or small amount." Again, when asked whether he was a member of a certain labor union, the witness answered, "That is my business." Afterwards he stated that he was a member, and was then asked why he said it was none of counsel's business when asked if he was a member, and the court said: "He probably thought so." *Held*, that such remarks did not constitute prejudicial error.

2. Where on a murder trial defendant claimed to have acted in self-defense, and there was testimony that a companion of the deceased, who was in the room at the time of a quarrel in which the latter was shot by defendant, picked up a cuspidor just before the shooting and that it was found to be broken after the affray was over, but there was no evidence that it was used as a weapon or as to how it was broken, rulings and remarks by the court as to the admission in evidence of the broken pieces of the cuspidor, to the effect that they might be received, together with certain broken chairs, and, if the jury found they were broken at the time in question, might be considered as tending to show the nature of the affray, are *held* not erroneous.

3. On a murder trial there was a question as to whether a witness for the prosecution had been with the deceased during the afternoon preceding the homicide, and several witnesses for the defense had testified to having seen them together in a certain

place at about 4 o'clock of that afternoon. Another witness then testified that he saw deceased at that time and place with a man whom he did not know and could not identify. The state moved to strike out this testimony, and the court said: "He didn't really give any." Afterwards the court told the jury that such remark was not well expressed and that he did not intend to intimate that the testimony was not credible or that it was not entitled to weight. *Held*, that this explanation removed any prejudicial error.

4. It was competent for the defense on a murder trial to show that a witness for the state was intoxicated at the time of the homicide, in order to discredit his testimony; but evidence that he was intoxicated an hour and a half later was properly excluded as immaterial.

5. Where on a murder trial the defendant claimed to have acted in self-defense and his testimony tended to show that when the fatal shot was fired he was struggling with the deceased and the muzzle of the pistol must have been within a few inches of the latter's vest, it was proper to permit the state in rebuttal, after testimony that there were no powder marks on the body of the deceased, to show experiments made by shooting the same pistol, using similar cartridges, through the vest at distances of two inches, eight inches, two feet, and four feet, resulting in powder stains upon the cloth when the pistol was fired at the two lesser distances, and to show by expert testimony that there would have been powder stains on the body if the pistol had been fired at a distance of six inches.

6. After instructing the jury as to necessary elements of manslaughter in the second degree under sec. 4351, Stats. (1898),—*i. e.* the unnecessary killing of another while resisting an attempt of such other to commit a felony or other unlawful act,—the court further told them in effect that if the killing was with premeditated design it was murder in the first degree, not manslaughter in any degree, unless justified under the law of self-defense. *Held*, that this instruction was not capable of causing the jury to believe that defendant, though acting in self-defense, might still be guilty of manslaughter in the second degree.

7. The evidence in this case is *held* to justify a finding that the killing was unnecessary and to sustain a conviction of manslaughter in the second degree under sec. 4351, Stats. (1898).

ERROR to review a judgment of the municipal court of Milwaukee county: A. C. BRAZEE, Judge. *Affirmed.*

For the plaintiff in error there was a brief by *Rubin &* *Zabel,* attorneys, and *E. T. Fairchild,* of counsel, and oral‧ argument by *Mr. W. B. Rubin* and *Mr. Fairchild.*

For the defendant in error there was a brief by the *Attorney General,* and *A. C. Backus* and *F. C. Eschweiler,* assistant district attorneys, and oral argument by *Mr. A. C. Titus,* assistant attorney general, and *Mr. Eschweiler.*

Winslow, C. J.· The plaintiff in error was charged with the murder of one Frank Tomlinson, September 6, 1906, at Milwaukee, and was convicted of manslaughter in the second degree, and prosecutes this writ of error to reverse the judgment which followed his conviction. The killing by shooting with a pistol was admitted, and the claim was that the defendant acted in self-defense.

The evidence shows that the plaintiff in error (hereinafter called the defendant) was at the time of the homicide an unmarried man nearly fifty years of age; that for about three years he had been rooming at 190 Fifth street in the city of Milwaukee, the latter part of the time with a woman named Bertha Krueger; that he was a structural iron worker and was employed by the Worden & Allen Bridge Company; that one Zemke had roomed at the same place about two years before the homicide and the defendant knew him; that defendant became acquainted with Tomlinson, who was also an iron worker, in July or August, 1906; that in the evening of Tuesday, September 4, 1906, Zemke, Tomlinson, and one Wiles called on defendant at his room and stayed some twenty or forty minutes and left; that on Thursday following Zemke and Tomlinson called again between 5 and 6 o'clock p. m., just after defendant had washed and dressed himself after his day's work and was about to go out after a pitcher of beer; that at defendant's invitation Zemke and Tomlinson sat down and ate some peaches, while defendant went out after the beer; that when defendant came back they

all had some beer and talked in a friendly way and Tomlinson went out after another pitcher; that when he returned Miss Krueger was in the room with defendant and Zemke; that afterwards Zemke went after another pitcher of beer; that about the time he returned a difficulty of some kind arose between Tomlinson and the defendant, which began with words, but ended in the defendant's shooting the deceased with a pistol in the abdomen; that deceased and Zemke then left the house; and that deceased was taken to the Emergency Hospital in a dying condition and died at about half-past 6.

According to Zemke's testimony no actual violence was offered by Tomlinson to the defendant, but when he (Zemke) returned with the beer Tomlinson was standing in front of defendant, who was sitting on a chair, and defendant had his hands on Tomlinson's hips; that defendant then got up, and he and Tomlinson moved westerly, facing each other, toward an alcove in which was the bed, the defendant's hands being still on Tomlinson's hips, and both were doing some talking; that Miss Krueger opened the drawer of a dresser and said, "Here, Jack," and in an instant the shot was fired, and the next he knew both men were lying on the bed, the defendant on the north end and Tomlinson on the south end; that Tomlinson then got up and went down stairs to the street with him (Zemke).

The testimony of the defendant and of Miss Krueger tended to show that Zemke and Tomlinson came to the defendant's room with the intention of doing the defendant some injury. According to their stories, which substantially agreed, it appeared that Zemke charged that Miss Krueger had said that he (Zemke) was a bum and owed her some board; that the discussion became general and acrimonious and the defendant and Tomlinson took part in it; that Tomlinson finally struck the defendant and knocked him on to the floor and got on him; that defendant got away and

Tomlinson pursued him, while Zemke picked up a cuspidor, apparently to throw at defendant; that defendant got to the dresser and opened it and got his pistol and warned Tomlinson to stop or he would shoot, but that Tomlinson still advanced and defendant backed into the alcove by the side of the bed; that Tomlinson then struck defendant, knocked him over on the bed, and jumped on him with his hands at his neck; that defendant then shot, and Tomlinson fell back on the other end of the bed, and then got up and left the room with Zemke.

The assignments of error will be taken up in their order as made.

1. It is claimed that the court made remarks in the presence of the jury, during the introduction of the evidence, which were so unfair and prejudicial as to call for reversal of the judgment.   These remarks will be briefly noticed.

During the cross-examination of the state's witness Zemke he was examined at some length as to his movements and the time of day when he saw Tomlinson on Tuesday, two days before the tragedy, and found difficulty in fixing any exact times, and, upon objection by the state's attorney that this line of examination was irrelevant and immaterial, the court said:

"I don't know what it has to do with it, but I will state this for the benefit of the witness: When you cannot state positively the time, you may say it was somewhere between 1 o'clock and 5, or whatever time you may have in mind."

Again, when Zemke had stated that he loaned some money to Tomlinson and was asked how much, he objected to answering, and the court said: "You may answer and let him know whether it was a large or small amount."   Again, after Zemke had stated that he marched with a labor union on Labor Day, being Monday before the tragedy, he was asked if he was a member of the organization, and answered, "That is my business," and after some further questions stated that

he was a member of Lodge No. 300. He was then asked why he said it was none of counsel's business when he was asked if he was a member, and the court said: "He probably thought so." It is said that these various remarks plainly indicated to the jury that the court sympathized with the witness. We have been unable to view the remarks as meriting· any serious condemnation. The last one mentioned might better have remained unsaid, but the examination had been protracted to an extreme length upon very trivial and inconsequential matters, evidently to the annoyance of the court, and the remark was quite natural and cannot be dignified into prejudicial error.

A cuspidor was in the room at the time of the difficulty, and there was testimony, as before stated, that Zemke picked it up just before the shooting. It was found to be broken after the affray was over, but there was no evidence that it was used as a weapon nor as to how it was broken. The broken pieces were offered in evidence by the defense, and upon objection by the state the court said, in substance, that he did not see its materiality; that if there was evidence that it was broken by the deceased or by Zemke he would receive it in evidence; that he could not see that it was as material as the revolver, but, inasmuch as it had been seen by the jury, it might as well be received for what it was worth. Defendant's counsel then asked that the court correct the statement or intimation made that it was admitted simply because the jury had seen it, and the court declined to withdraw the statement, and again stated that he did not see the materiality of it, inasmuch as there was no testimony showing that it was used. Later in the trial, after two chairs, which the defense claimed were broken in the affray, had been received in evidence, the court said to the jury that both the chairs and cuspidor "were received and may be considered by the jury if it is found that they were broken at that time; the circumstances having such bearing upon the case indicat-

ing the character of the affair as you may find them entitled to receive, disregarding any remarks that may have been made by the court at the time of their reception." Defendant's counsel then asked the court to bear in mind that the cuspidor was offered not simply because it was broken, but because Zemke had it in his hand, to which request the court replied:

"As I say, they will be received together with all the evidence that was received at the time in explanation of how they became broken for the purpose of indicating the nature of the affray. If you believe and find that that testimony is credible, that is for you to determine and not for the court."

We have been unable to appreciate the force of the objections made to the court's remarks as to the cuspidor. Had it been unbroken, its physical appearance would certainly cut little or no figure, as it was not claimed to be exceptional in any way. The defendant and Miss Krueger had testified that Zemke had picked it up and Zemke had denied the fact, and the jury would be no better qualified to determine which statement was true by examining it unbroken. So the question of its materiality as evidence doubtless depended on whether it was broken in the affray, for this would tend to prove that the affray was violent, as claimed by the defense. For this reason, doubtless, the court allowed it to go before the jury and be considered by them, if they found that such was the fact. In these rulings we are unable to see that there was any error.

Zemke testified that he had not been with Tomlinson during the afternoon preceding the tragedy. On the other hand, the defense claimed that Tomlinson and Zemke were together during the greater part of the day, and called several witnesses who testified to having seen them together at about 4 o'clock in the afternoon near the Schlitz building on Third street. They then called one Simpson, who testified

to seeing Tomlinson near the Schlitz building at about 4 p. m. and that a man was with him whom he did not know and could not identify. The state moved to strike out the testimony, and the court said: "He didn't really give any." At the opening of court on the following day the court said to the jury, after referring to this remark:

"That, perhaps, was not well expressed. The court intended to say that he had testified merely to the fact that the deceased was at the brewery, not intimating that the testimony was not credible or that it was not entitled to weight, intending to express no opinion on that subject. The gentlemen of the jury will remember it. I intended to express no opinion as to the effects of that evidence, but merely to state that the witness testified that the deceased was at the brewery and somebody was with him. You remember that in connection with that testimony."

We can see no prejudice in this matter. Of course, the only material fact was that Tomlinson and Zemke were together. The witness did not and could not testify to this fact. His testimony was at most of very slight probative force, and the careful explanation by the trial judge of his first incautious remark must certainly be considered as removing any prejudicial error, even if it be conceded that there was ground for complaint before the explanation was made.

2. The defense claimed that Zemke had been drinking considerably on the day of the homicide and was under the influence of liquor at the time, and introduced witnesses tending to show that he had taken a number of drinks during the day. It appeared that Zemke called at the Emergency Hospital about an hour and a half after the homicide, and the defense called Dr. Donahoe, one of the physicians at the hospital, and attempted to prove by him that Zemke was intoxicated at the time of the call. The testimony was excluded and rightly so. It was entirely competent to prove that Zemke was intoxicated at the time of the transaction,

because that fact would tend to throw doubt upon the accuracy of his observation of events and thus in a measure discredit his testimony; but to prove that he was intoxicated an hour and a half later would have no such tendency and would be strictly immaterial. *Mace v. Reed,* 89 Wis. 440, 62 N. W. 186.

3. There was testimony on the part of the state tending to show that there were no powder marks on the body of deceased. On the other hand, the testimony of the defendant tended to show that when the fatal shot was fired the bodies of defendant and Tomlinson were in close proximity, and the muzzle of the pistol could not have been more than a few inches distant from the vest of Tomlinson. The state on rebuttal offered testimony as to experiments made by shooting bullets from the same pistol, using similar cartridges, through the vest of the deceased at distances of two inches, eight inches, two feet, and four feet; the result of such experiments being that there were powder stains upon the cloth when the pistol was fired at the two lesser distances, but not when fired at the two greater distances. Expert testimony was also admitted tending to show that there would be powder marks on the body had the pistol been discharged at a distance of six inches. All this testimony was objected to as incompetent and not proper rebuttal, but we are unable to agree with this contention. The results of experiments made under conditions which are shown to the trial court to be essentially the same as the conditions existing at the time of the original transaction may properly be admitted in evidence. *Zimmer v. Fox River V. E. R. Co.* 123 Wis. 643, 101 N. W. 1099. The results of the experiments tended to directly contradict the defendant's testimony as to the close proximity of the deceased and thus to discredit the claim of self-defense. The testimony, therefore, was rightly received in rebuttal.

4. It is claimed that the court erred in the charge to the

jury. The court submitted to the jury murder in the first and second degrees and manslaughter in the second and third degrees, and, as before stated, the defendant was convicted of manslaughter in the second degree under sec. 4351, Stats. (1898) ; that is, he was convicted of unnecessarily killing another while resisting an attempt of such other to commit a felony or other unlawful act. After reading sec. 4351 and instructing the jury as to the necessary elements of an offense under that section, the court said:

"But, gentlemen, if you find from the evidence, beyond a reasonable doubt, that at the time of the homicide the defendant entertained a premeditated design to kill Tomlinson, then such killing would be murder in the first degree, not manslaughter in any degree, unless such killing was justified under the law of self-defense as hereinafter instructed."

The only complaint made is that this instruction was capable of causing the jury to believe that the defendant, though acting in self-defense, might still be guilty of manslaughter in the second degree. We do not think the instruction capable of any such interpretation and hence must overrule the objection.

5. It is finally claimed that the verdict is contrary to the evidence and based upon prejudice, and a strong argument is made upon the facts, based principally upon the inconsistencies and improbabilities of Zemke's story of the homicide as well as the numerous contradictions by other witnesses of more or less material statements made by him. We must admit that had the defendant been convicted of murder in the first degree we should feel hesitancy in sustaining the conviction; but after careful examination of the record we think there was ample evidence to justify the finding that the killing was unnecessary, under sec. 4351, *supra.*

*By the Court.*—Judgment affirmed.