UNITED STATES of America ex rel. Cleveland THOMPSON, Appellant,

v.

Charles L. DYE, Warden, Allegheny County Jail, Appellee.

No. 11419.

United States Court of Appeals Third Circuit.

Argued Jan. 17, 1955.

Filed April 21, 1955.

Rehearing Denied May 23, 1955.

Louis C. Glasso, Pittsburgh, Pa., for appellant.

Albert A. Fiok, Pittsburgh, Pa., for appellee. (James F. Malone, Jr., Dist. Atty., Pittsburgh, Pa., Frank P. Lawley, Jr., Deputy Atty. Gen., Frank F. Truscott, Atty. Gen., for appellee on the brief).

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

A jury sitting in the Court of Oyer and Terminer of Allegheny County, Pennsylvania found relator-appellant guilty of murder in the first degree and recommended the death penalty. The conviction and the death sentence were affirmed by the Pennsylvania Supreme Court.[1]

The first time the matter came into the federal court was on application for habeas corpus which alleged incompetence of defense counsel. We affirmed the denial of the writ by the district court.[2] Thereafter, following various other steps in the cause, another petition for habeas corpus was filed in the district court. The ground urged was the withholding and suppressing of vital testimony favorable to relator at his trial by the Commonwealth. After hearing the court denied the petition. On appeal we remanded the case to the district court for a finding of fact whether the court credited the testimony of police officer Heagy or the prosecutor as to what the former told the latter before trial concerning the condition of the accused at or about the time of his arrest.[3] In pursuance of this the district court [123 F.Supp. 761] made further findings of fact, particularly that:

"2. Mr. Heagy did inform the prosecutor that he participated in the arrest of the relator in a barroom where the latter had been in a brawl and had been disarmed. He further informed Strauss, as the latter admits, that the relator was at that time under the influence of liquor to a quarrelsome degree; that he smelled the odor of alcohol on him; that his shirt and clothes were torn; and that he was perspiring and 'messed up.'

"3. The prosecuting officers did not communicate to defense counsel or to the State trial judge prior to trial that, at the time of relator's ar-

1. Commonwealth v. Thompson, 1951, 367 Pa. 102, 79 A.2d 401, certiorari denied, 1951, 342 U.S. 835, 72 S.Ct. 58, 96 L. Ed. 631.

2. 1953, 203 F.2d 429, certiorari denied, 1953, 345 U.S. 960, 73 S.Ct. 946, 97 L. Ed. 1380.

3. 1953, 208 F.2d 565.

rest, several police officers detected the odor of alcohol on relator's breath; that he showed signs of having been engaged in a fight; and that at least one officer would say he was under the influence of liquor to a quarrelsome degree."

The court also made an additional conclusion of law, namely:

"The prosecuting officers were not in possession of information or evidence vital to relator's defense which they were obliged to disclose to the defense or to the court."

▪ The court, citing our decision in United States ex rel. Almeida v. Baldi, 3 Cir., 1952, 195 F.2d 815, 33 A.L.R.2d 1407, certiorari denied, 1953, 345 U.S. 904, Baldi v. U. S. ex rel. Almeida, 73 S.Ct. 639, 97 L.Ed. 1341, quite properly states: "The suppression of evidence may be a denial of due process when it is vital evidence, material to the issues of guilt or penalty." 123 F.Supp. 759, 762. See also United States v. Rutkin, 3 Cir., 1954, 212 F.2d 641, 644–645.

The important question before us is whether the district judge erred in holding as a matter of law that the withheld and suppressed evidence was not vital to the defense of the accused.

The prosecution had alternative theories: (1) that Thompson had committed the killing of Wallace Russell, the bartender at a place called the "Barbary Coast", in the course of an armed robbery; or (2) that Thompson wilfully and with premeditation killed said Wallace Russell. The defense, while admitting the killing, denied any robbery motivation and contended that Thompson through drink and drugs was in such a mental state that he could not have formulated the necessary intent to raise the killing to first degree murder and that in any event, because of his condition, his offense did not warrant the

death penalty. Thompson's testimony was to that effect. One prosecution witness, Mattie Spells, to some extent corroborated him but on a plea of surprise as to another matter the Commonwealth impeached her credibility. One eye witness to the shooting testified that Thompson did not appear intoxicated. The Commonwealth also produced the bartender at the place where Thompson was arrested, and he testified that there was nothing wrong with Thompson, that he was not drunk, and that his eyes were normal and not glassy. The only police witness questioned as to Thompson's condition was the other arresting officer, Dubis. He said Thompson was "perfectly normal" and "perfectly all right in every respect". He said nothing regarding an odor of alcohol on Thompson's breath and when asked how he knew he was all right, he replied "The man walked out with me. I have arrested many a drunk, if you are referring to that." [4]

None of the other police officers who were witnesses at the trial said anything about Thompson's condition or relating to an order of alcohol on him. Officer Heagy, though subpoenaed by the Commonwealth as a witness and present at most of the trial, was not called to the stand by the prosecutor. He was actually excused by the prosecutor from attendance at the night session of the trial at which Dubis testified. Heagy therefore did not hear that testimony nor, according to him, hear about it until long after the trial. Thompson was arrested within approximately four hours of the shooting. The Commonwealth argues from this that Heagy's testimony is irrelevant because it is too remote. The proofs do not justify that contention.

The shooting occurred in the Barbary Coast somewheres around 7:00 o'clock in the evening of September 13, 1949. The Commonwealth produced three eye

---

4. At the district court habeas corpus hearing Dubis testified that he did detect an odor of alcohol on Thompson's breath and that "His shirt was torn open, and there was nothing under him but his bare skin

* * * he was sweating * * * he looked like he took a beating; * * * it looked like somebody grabbed his hair and was pulling on his hair."

witnesses who said that they were eating fish sandwiches and drinking soda pop at the time of the shooting. According to their testimony they saw no one in the Barbary Coast drinking intoxicating liquor.[5] One police officer who had made an examination of the premises the night of the shooting, testified: "There was no evidence of beer or liquor. Nothing outside of three empty cases of soft drinks." [6] According to Thompson, however, the only drinks served at the Barbary Coast were "moonshine whiskey and a glass of water." He testified at the trial that he had started drinking in the Barbary Coast around 3:00 o'clock that afternoon; that prior to the shooting he had drunk at least four pints of moonshine whiskey "drinking pint for pint" and in addition had been smoking marijuana which he bought "from a guy peddling it in there." [7] He said he imagined he smoked about four marijuana cigarettes during the time he was there.[8] He said that at the time of the shooting "I was under the influence of everything."

In the interval between the shooting and his arrest there was testimony at the trial that Thompson visited the home of Mattie Spells around 8:00 P.M. and asked for a loan of two dollars. Mattie Spells testified that she never saw him looking like he did that night. "His eyes were glarey. He wasn't himself at all. * * * He looked like he was under the influence of something that particular night." There was also testimony that he walked right past the police station and, shortly after 10:00 o'clock that night,[9] arrived at the Triangle Bar which was some nine or more blocks from the Barbary Coast and "all up hill." [10] At the Triangle, he was observed "sliding up and down the bar" and taking a "tuck at his coat" where the bartender observed his gun. The bartender called the police. Meanwhile Thompson had asked another patron for a cigarette (even though Thompson had seven on him when arrested) and when told he had none, Thompson pushed one hand in his face and reached for his gun. The patron grabbed him and with the help of others, Thompson was disarmed and held down until Patrolmen Dubis and Heagy arrived to make the arrest.

According to the Triangle bartender who served him, he gave Thompson only two drinks. There is no evidence from the bartender or Thompson or anyone else that Thompson actually drank any liquor in the Triangle or anywhere after leaving the Barbary Coast.

5. A fourth eye witness said that he was drinking a bottle of beer and a fifth eye witness said they were giving away beer, wine and pop but not one of the five corroborated Thompson's story that moonshine whiskey was being sold.

6. Two other police officers, however, said they did find four gallons of moonshine whiskey under the bar; Thompson's ex girl friend said everyone was drinking moonshine; and the manager of the place admitted on cross-examination that some people there "could have been" drinking moonshine.

7. At the time of his arrest seven cigarettes were found in his possession but the Commonwealth produced an expert witness who, upon analyzing one of the cigarettes, had found no marijuana.

8. Earlier in 1949 he was picked up on suspicion of using marijuana. He also testified that he had sustained a nervous breakdown when overseas in 1942 during his Army service, for which he had been given paraldehyde, phenobarbital and later on electric shock treatments.

9. September 13, 1949 was an election day in Pittsburgh. In accordance with the law the Triangle Bar did not open until 10:00 P.M.

10. Further testimony adduced at the habeas corpus hearings showed that Thompson, between the shooting and his arrest, also went to his own home where he stayed for about fifteen minutes, visited the home of Mr. and Mrs. Loice Spells (brother and sister-in-law of Mattie Spells) for about a half hour, and with the help of Mr. Spells who "partly toted him" went back to Mattie Spells' house a second time. His landlady, Mrs. Katherine Smith, testified that he "fell up the steps" and was in "a very drunken, stupid condition." Both Mr. and Mrs. Spells said he was in a drunken or drugged condition—"he was drunk and staggering."

Assuming that he did take the two drinks at the Triangle there is nothing which would warrant an inference that what the police officers observed about his condition shortly thereafter had been brought about by those two drinks and was not a continuation of the state he had been in at the time of the shooting. Clearly the relevancy and weight of the heretofore undisclosed evidence of the arresting officers and some of those at the station was for the jury. From Heagy's conclusion that Thompson was under the influence of liquor to a quarrelsome degree, plus his statement that Thompson smelt of alcohol, that his shirt and clothes were torn, and that he was messed up, together with Dubis and other policemen now saying that Thompson smelt of alcohol, that he showed signs of having been engaged in a fight, and with Mattie Spells stating at the trial that after the shooting Thompson "looked funny and while his eyes were all glassy I was afraid of him" and with no evidence of further drinking at all after the shooting except perhaps the two drinks at the Triangle Bar shortly before he was arrested, the jury could have reasonably inferred that Thompson had been in a far worse state of intoxication when he shot Russell than at the time he was arrested and from the same causes.

▮ But, argues the State, even so, the proffered evidence is merely cumulative. It argues that Thompson had so testified as did Mattie Spells. Thompson, the defendant, did tell about the dreadful thing he had done while "under the influence of everything" as best he could which wasn't very good and was not believed by the jury. Mattie Spells had been discredited by the State. In that situation the effect of Heagy's testimony, of Dubis finally revealing that he had smelt alcohol on Thompson, and of the other police witnesses verifying this, might well have induced the jury to believe Thompson's evidence about his physical and mental state. The result could have been a finding of second degree murder,[11] or if first degree, a recommendation of life imprisonment.[12] Admittedly, even with that evidence the jury might well not have accepted Thompson's testimony, indeed might not have credited Heagy, Dubis and the other policemen. But those conjectures do not permit that evidence to be brushed aside as merely cumulative. Nor can it be held as a matter of law to be unimportant to the defense here. It was substantial evidence which should have been but never was submitted to the jury (the only tribunal entitled to pass upon it) in connection with what the court did charge as to the effect of the drunkenness of Thompson or that he was under the influence of marijuana or a drug at the time of the killing.[13] See Commonwealth v. Edwards, 1955, 380 Pa. 52, 110 A.2d 216; Commonwealth v. Detweiler, 1910, 229 Pa. 304, 78 A. 271.

Appellee's final point is that Heagy was available as a witness for the defense and it cites the district court's language that "Evidence is not suppressed or withheld if the accused has knowledge of the facts and circumstances or if they otherwise become available to him during the trial." We have no quarrel with that general principle but it has no relevancy

---

11. "Intoxication sufficient to deprive the mind of power to form a design with deliberation and premeditation, and to properly judge the legitimate consequences of an act, will reduce a killing from murder in the first degree to murder in the second degree." Commonwealth v. McCausland, 1944, 348 Pa. 275, 277, 35 A.2d 70, 71.

12. "It is true * * * that the question of intoxication was important in connection with the determination of the penalty * * *." Commonwealth v. Simmons,

1949, 361 Pa. 391, 404, 65 A.2d 353, 359, certiorari denied, 1949, 338 U.S. 862, 70 S.Ct. 96, 94 L.Ed. 528.

13. The opening language of the trial court on this point was:
"Now, members of the jury, at this point I desire to call to your attention the effect of the drunkenness of this defendant, or that he was under the influence of marijuana, or a drug at the time of this occurrence. *That is a fact for you to find.*" (Emphasis supplied.)

to the facts before us. Heagy was in court as a potential prosecution witness throughout the trial with the exception of the night Dubis was on the stand. The latter gave damaging evidence against the defendant. At the close of the night session at which Dubis testified, the prosecutor stated in open court: "At this time I could call a few other police officers who would *corroborate what has already been testified to.* I see no reason why we should merely prolong the testimony now when the witnesses are not here." (Emphasis supplied.) That was the trial picture on this particular phase of the state's case and there was no knowledge by Thompson or anyone interested in him that Heagy's testimony differed so vitally from that of Dubis until years after the trial. Had the defense trial lawyer been without peer as an advocate he still could hardly have been held to putting the second arresting officer on the stand where there was every reasonable expectation that his story would dovetail with what Dubis had said. The contention apparently seriously urged that this application must fall because under the facts of the trial the defense did not call Officer Heagy is specious. We cannot accept it.[14]

The judgment of the district court will be reversed and the case remanded for the issuance of a writ of habeas corpus. However, nothing we have said here precludes a new trial or the taking of proper steps to hold the defendant in custody pending such a new trial. See United States ex rel. Almeida v. Baldi, supra, 195 F.2d at page 825, footnote 30.

KALODNER, Circuit Judge (concurring).

I agree with my brethren that *under the special circumstances existing in this case* the District Court erred in denying relief to the accused.

In my opinion since the Commonwealth introduced testimony by the Triangle Bar bartender and Dubis, one of the arresting officers, at the accused's trial, that he was *not* under the influence of liquor at the time of his arrest some four hours after the shooting and that it further stated to the jury that it "could call a few other police officers who would corroborate what has already been testified to" (by the bartender and Dubis) that it committed fundamental unfairness to the accused by withholding Heagy's available testimony that the accused *was* "under the influence of liquor". The Commonwealth's present contention that Heagy's testimony is irrelevant because it is too remote doesn't square with its introduction of the bartender's and Dubis' testimony dealing with the same "remote" period. The Commonwealth cannot have its cake and eat it too. If, under its view, testimony of sobriety four hours after the shooting was relevant at the trial, certainly Heagy's testimony to the contrary was also relevant.

For this specific reason alone I would reverse, because it cannot be gainsaid that the Commonwealth's suppression of Heagy's testimony constituted fundamental unfairness under the circumstances recited.

I have stated this view because in my opinion Heagy's testimony would ordinarily have been inadmissible since it related to a time four hours after the shooting occurred and its suppression (absent the offering by the Commonwealth of testimony as to the accused's sobriety four hours after the shooting) would not have constituted fundamental unfairness by reason of its lack of relevance to establish the accused's sobriety

---

14. Appellant has two other points: (1) that the trial court erred in not finding that Officer Heagy also told the prosecutor that Thompson acted extremely drunk, incoherent and insane; and (2) that the trial court erred in refusing to admit Officer Heagy's statement, made while fatally wounded in the line of duty, to the effect that everything he had said at the habeas corpus hearing was the truth. On the first we are unable to find the district judge clearly wrong as there was evidence supporting his conclusion. On the remaining point, the statement was hearsay. It was not within the dying declaration exception. 5 Wigmore, Evidence, Sec. 1433 (3rd ed. 1940). It was therefore properly excluded.

or drunkenness at the time of the shooting.

While the Pennsylvania courts have not declared themselves on this issue of relevance of testimony as to sobriety or drunkenness four hours after a crime is committed other jurisdictions have uniformly ruled such evidence inadmissible.[1]

HASTIE, Circuit Judge (concurring).

This concurrence expresses an additional thought about the problem of this case rather than any disagreement with the reasoning of the court. My concern is that no unduly broad implications be read into this decision.

The matter in controversy is the extent of the duty of public officers charged with the investigation and prosecution of crime when they discover conflicting evidence on a material point. The government and the court below seem to have believed that once the prosecutor, having examined all of the available evidence, is convinced that the truth of an issue lies on one side he is relieved of any obligation to disclose the existence of evidence which in some degree supports what he believes would be a false conclusion. However, it seems to me that it is not possible to lay down a rule of thumb for such situations. It can be said that the prosecutor must not act in an essentially unfair way. But this is an area in which the question of funda-mental fairness depends so much upon the facts of the particular case that a precise rule can not be devised.

It seems likely that many situations will arise in which a prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false. But there are other circumstances in which a prosecutor must, or certainly should know that even testimony which he honestly disbelieves is of a type or from a source which in all probability would make it very persuasive to a fair minded jury. This is notably true of testimony of a police officer, and most certainly of an arresting officer, favorable to a contention of the accused person. Here the prosecutor not only kept quiet about the existence of such testimony, but, as Judge McLaughlin points out, even stated in open court that other police officers if called "would corroborate what already has been testified to." Thus, the wrong of nondisclosure of obviously significant testimony was compounded by a misleading affirmative statement as to the nature of the available but unused testimony.

In brief, it is not every case in which the prosecution must reveal the availability of testimony inconsistent with the government's contentions. But in special circumstances such nondisclosure may, and here it certainly does, amount to fundamental unfairness in the trial of a criminal case.

---

1. In Jordan v. Commonwealth, 181 Va. 490, 25 S.E.2d 249, evidence of intoxication one-half hour after killing was excluded; in Goodman v. State, 20 Ala.App. 392, 102 So. 486, evidence of intoxication as part of res gestae one hour afterwards was excluded; in Pollock v. State, 136 Wis. 136, 116 N.W. 851 court held it could be shown that Commonwealth witness was intoxicated at time of killing but could not show intoxication one and one-half hours afterward; in Raynor v. Wilmington, S. C. R. Co., 129 N.C. 195, 39 S.E. 821, evidence four hours after killing was excluded.