Aloysius J. Helia, J.
On the evening of May 19,1971, Patrolmen Thomas Curry and Nicholas Binetti were shot with a machine gun and sustained serious physical injuries. This shooting took place on Biverside Drive, in the Borough of Manhattan. It was believed that a Pinto or Mustang sports car was used by the perpetrator.
About 10:30 p.m. on May 21, 1971, Patrolmen Waverly Jones and Joseph Piagentini were shot and killed on Harlem Biver Drive, also in the Borough of Manhattan.
The Police Department immediately set up four special telephone numbers and urged any member of the general public who had any information concerning these shootings to call one of these numbers. It was further represented that the identities of those persons calling would be kept confidential.
This information was carried to the public via radio, television and the press. The Daily Mirror of May 21, 1971, the New York Times of May 23 and the Daily News of May 23 and 24 printed this information. The Daily News of May 23 printed “ A Plea to the Public”. The Patrolmen’s Benevolent Association posted a reward of $5,000.
In connection with the special telephone numbers, the Police Department maintained -a special logbook in which the substance of the calls coming in over these wires was recorded. The information provided was then turned over to other police personnel for appropriate action.
The defense has made a motion that this logbook be turned over for its inspection. It is argued that they are entitled to this discovery under the principle of law contained in Brady v. Maryland (373 U. S. 83) concerning any material of1 an exculpatory nature. It is further claimed that the defense should not be bound by the prosecutor’s determination, made in camera, that the information would not be helpful to the defense.
The District Attorney strongly opposes the application.
*163 The court read the logbook in camera. It contains 96 pages of messages, running from page 5 to 100. (The first four pages, which are completely irrelevant, are missing. They are irrelevant because the Curry-Binetti shootings, which occurred two days prior to this killing, cover most of the opening pages. In addition, it is obvious that prior to Curry-Binetti the book was used for other purposes unrelated to these matters.)
The court then heard testmony, in camera, over a period of three days, concerning the logbook entries relating to this case and the follow-up thereon. This testimony was stenographically reported and the minutes sealed..
Among other things the log contains calls relating to the Curry-Binetti shooting and other calls that neither relate to the Curry-Binetti nor Pi'agentini-Jones shootings but which resulted in 62 arrests for assorted unrelated crimes.
Some callers gave fictitious names and/or addresses. Some involved innocent people for a lark or for no apparent reason. Others involved real people who were innocent, solely for harassment to satisfy some grudge; Some sought merely to inconvenience the police. Many calls were anonymous.
These reports contain all kinds of raw material, hearsay, investigative leads, false accusations and irrelevaneies. (One might almost take judicial notice of the fact that, in most celebrated cases, crank calls are received.)
Research of the applicable law reveals many cases dealing with the subject of disclosing exculpatory material.
They provide broad guidelines for the problem in general and specific rules for specified situations. However, none deal with a case remotely resembling this one.
In Brady v. Maryland (373 U. S. 83, 87, supra) the United States Supreme Court held,1 ‘ that the suppression by the prosecution of evidence favorable to an accused * * * violates due process where the evidence is material * * * irrespective of the good faith or ¡bad faith of the prosecution.”
“A prosecution that withholds evidence * * * which, if made available, would tend to exculpate him * * * helps shape a trial that bears heavily on the defendant.” (pp. 87-88).
In Simos v. Gray (356 F. Supp. 265, 270) the court said, ‘ ‘ Difficult constitutional questions remain to be solved in this area. For instance, I hesitate to endorse the requirement that the State disclose all information falling into its hands which may tend to cast doubt on the credibility of its witnesses.”
“ Perhaps the best approach ”, said the court, “ when material evidence has been negligently suppressed is not to center *164 on the scope of the State’s duty but to recognize that the duty to disclose extends to all evidence which would have helped the defendant and then to center on the fairness of upholding the defendant’s conviction despite the suppression.”
In People v. Fein (18 N Y 2d 162, 171-172) decided in 1966, subsequent to Brady, the court said:
“ the public prosecutor * * * must have some area in which he is permitted to judge, in the context of the entire case, the value of evidence to the defense * * * he must have some discretion in determining which evidence must be turned over to the defense. These claims are examples of why no court has ruled that every statement obtained by the District Attorney or the results of every avenue of investigation * * * must be disclosed * * * regardless of its materiality, credibility or potential impact on the trier of fact. As Judge Hastie has stated in a frequently cited passage (United States ex rel. Thompson v. Dye, 221 F. 2d 763, 769, cert. den. 350 U. S. 875), there are many situations in which a prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false”.
Similarly, Mr. Justice Fortas stated in Giles v. Maryland (386 U. S. 66, 98): “ It is not to say that the State has an obligation to communicate preliminary, challenged or speculative information.”
In Moore v. Illinois (408 U. S. 786, 795) decided after Brady, the court said: “ We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.”
In a dissent Mr. Justice Marshall said (p. 809): “ When the State possesses information that might well exonerate a defendant in a criminal case, it has an affirmative duty to disclose that information. While frivolous information and useless leads can be ignored, if evidence is clearly relevant and helpful to the defense, it must be disclosed.”
Where and under what circumstances is the line of disclosure or nondisclosure drawn?
To grant the application herein would have a profound effect on the administration of justice with no tangible beneficial returns to anyone. Over a period of two years many motions have been brought and determined. In addition, during the past four weeks a motion was heard in Federal court, and I took testimony on six other motions while denying a seventh after argument without a hearing. Presently, without more, it is anticipated that the trial will last several months.
*165 Yet, will disclosure significantly and properly aid the defense?
Here it can be reasonably assumed that the police had more than the usual interest in apprehending those responsible for ambushing two brother officers. As a consequence, any information which they believed to have merit would be followed. This belief is fortified by the evidence which shows that other information in the logbook was followed and resulted in 62 arrests completely unrelated to the case at bar.
It is also worthy of note that in over two years of investigation no name referred to by an inform'ant was ever repeated by another or cropped up anywhere else in the investigation.
The unreliability and highly speculative aspects of the information provided in the logbook are highlighted by the statistics. Approximately 150 calls were received in regard to this case. The People’s theory is that five persons were involved, with two of the five being shooters. This would serve to indicate that, conservatively, a high percentage of callers were in error.
The strength and basis of the People’s case as recounted on the hearing and the nature of the proof further serve to indicate the falsity and unreliability of the log information.
Should these logbook entries be turned over, it could significantly adversely affect future investigations. Law enforcement authorities might have to abandon the use of this device with a resultant loss of potentially valuable information. This would be against the public interest, including that of1 persons falsely accused.
From another aspect, turnover could result in perpetrators of highly publicized crimes flooding police channels with false information in an effort to becloud the issue.
Quite apart from the calls referred to herein, the logbook contains information which led to 62 unrelated arrests. This serves to indicate the value of this investigative tool in the public interest. Public policy requires that this source not be dried up and made unavailable in a time of high crime by disclosing the identity of the callers.
In the instant case, where two police officers, who were walking the street, were shot down from behind for no apparent reason, if the identities of informers were disclosed in such a case of callous murder, you could hardly expect the citizenry to readily again come forward.
This is not to say, however, that should such information reasonably indicate reliable evidence of ¡benefit to a defendant that it should not be made available.
*166 “ The bar of privilege in regard to informers rests on the public policy of encouraging persons to aid in the prosecution and detection of crime. Nevertheless, the privilege is not unyielding or inflexible, and its application in each case depends on the particular facts and circumstances involved. In every instance a balance between the public interest in promoting the flow of information to law enforcement officers and the right of the accused to properly defend himself must be struck. This decision rests with the court.
“In New York the privilege extends to the contents of the communication as well as to the identity of the informer, and while at first glance this practice might seem unjustified, it is required to .afford complete protection by eliminating the possibility of identification through the nature of the information reported ”. (Fisch, New York Evidence, pp. 376^377.)
Roviaro v. United States (353 U. S. 53, 59, ,62) ¡states in pertinent parts:
“ What is usually referred to as the informer’s privilege is in reality the Government’s privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. * * * The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement, The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation. * * *
“We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for [balancing the public interest in protecting the flow of information against the individual’s right to prepare his defense. Whether a proper balance renders nondisclousure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer’s testimony, and other relevant factors.”
The Roviaro rationale was quoted with approval by Chief Judge Ftjld in People v. Malinsky (15 N Y 2d 86, 92).
The Court of Appeals held in People v. Cerrato (24 N Y 2d 1, 6) “ The need to protect the government’s privilege of nondisclosure of the identity of informants to encourage citizens to communicate their knowledge of crime to law enforcement officials is self-evident and has recently been reaffirmed by the Supreme Court. (McCray v. Illinois, 386 U. S. 300; Lewis v. *167 United States, 385 U. S. 206, 210; Hoffa v. United States, 385 U. S. 293, etc.). * * *
“ However, the public interest in effective law enforcement must be balanced against defendant’s interest in disclosure so that he may explore the justification * * # The government’s privilege of nondisclosure of the identity of informants is limited by the ‘ fundamental requirements of fairness ’ and must give way where ‘ its assertion would seriously prejudice the defense “ by making a fair hearing impossible
This case is peculiar to itself. The usual case involving the informer privilege arises in connection with one informer. Additionally, in those cases the People concede that the informer has some knowledge of the surrounding facts and circumstances. Here we are concerned with about 150 informers, all of whom the People claim provided useless information. The court does not assert, however, that every lead was run into the ground or that something more could not have been done. But overall, under all of the facts and circumstances, the information does not meet the standards for turnover, by virtue of one defect or another, to wit, unreliable, speculative, hearsay, unfounded, rebutted by People’s case, etc.
There is a .statutory scheme provided for privileged communications. It covers husband and wife, doctor and patient, penitent and confessor, etc. The informer privilege is not covered by statutory exemption. However, case law does make provision in some circumstances.
A spouse, doctor or confessor may possess an exempt confession made under highly reliable circumstances. An informer may have information which he is induced to provide only on the assurance of governmental authorities, publicly made, that his identity will not be disclosed. It would seem that under these circumstances and the peculiar facts of this case a moral commitment of overriding public importance has been made with the general public not to disclose identities. It should be honored.
I would add one caveat to the foregoing. Any lead or evidence that reliably indicates the innocence of any defendant should be disclosed.
To further illustrate the extremes and absurdities to which one could go in this area, the whole Nation saw on television Jack Ruby shoot down President Kennedy’s killer in a Texas jail. Thereafter, if 10 persons called the police and named 10 other persons as the slayer and that it was not Jack Ruby, would the police have to provide the defense with that informa *168 tion? And under People v. Brown (26 N Y 2d 88) and People v. Sullivan (43 A D 2d 55) would Ruby Ibe .permitted to call the 10 named culprits to the stand and claim Fifth Amendment privileges; or, in the alternative, would the 10 informants be permitted to testify, in the absence of the alleged culprits, that they heard the culprits say that they carried out the killing in the Texas jail? I think not. A closer material connection must first be established. To hold otherwise would only make a mockery of the law and hold it up to public ridicule. It would unduly impede the administration of justice and further slow its pace below the snail’s rate at which it now limps along.
This is not to say that the facts or information in the present case are that clear. However, the principle is the same and the case is susceptible to such abuse. Out of about 150 calls it is conceivable that 10 witnesses might be called and assert Fifth Amendment rights in the safe conclusion that realistically they would never be tried for the crime.
In People v. Riccardi (73 Misc 2d 19, 22-23, affd. 40 A D 2d 1083) Vetraho, J. said: “ The underlying reasons for admitting a declaration against penal interest as an exception to the hearsay rule are necessity and ‘ circumstantial probability of trustworthiness ’ (Richardson, Evidence [9th ed.], § 237) * * * The court must be able to conclude that * * * that is. a sufficient ‘ probability of trustworthiness ’ to fit the hearsay exception before it is received in evidence.
“ There must ibe an awareness by the declarant at the time of the making of the statement that it will render him subject to criminal prosecution to give the statement the inherent ‘ probability of trustworthiness ’ (Richardson, Evidence [9th ed.], § 244).”
This case is unlike any reported case of which this court is aware. Due to its peculiar facts and circumstances, the overriding public policy and interest in safeguarding the identities of persons providing information to law enforcement with a guarantee of anonymity, the unnecessary delay in the administration of the criminal justice system, the strength and nature of the People’s case and the lack of confirmed substance to the information supplied, in the court’s discretion, the motion to turn over the logbook is denied.