CHAPIN, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–714–CR. Submitted on briefs February 2, 1977.— Decided June 1, 1977.*
(Also reported in 254 N.W.2d 286.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, and *Mark Lukoff,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Michael R. Klos,* assistant attorney general.

DAY, J. On May 28, 1975 the plaintiff in error (hereinafter defendant) Leroy Chapin was convicted of armed robbery contrary to sec. 943.32(1)(b) and (2), Stats., and concealing identity contrary to sec. 946.62. He received an indeterminate sentence of not more than ten years for armed robbery and a concurrent term of not more than one year for concealing identity.[1]

The issues in this case concern the testimony of prosecution witness W. P., the only witness to positively identify the defendant as committing an armed robbery. The issues are:

(1) Did the lower court's refusal to allow the defendant to impeach a prosecution witness by reference to two prior mental commitments operate to deny defendant due process of law?

(2) Should a new trial be granted in the interests of justice?

At around 6:30 p.m. on January 7, 1975 two men entered the Propson Pharmacy in Oshkosh. According to pharmacist Gerald Perschbacher both wore stocking caps and scarves which covered their faces up to the bridge of the nose. One man said, "This is a holdup." One man had a gun. The man with the gun ordered Perschbacher to open the safe and put the money in a bag. He then demanded that Perschbacher fill a second bag with drugs. The man with the gun fired a shot over Perschbacher's shoulder into the ceiling.

Trudy Brandt, a part-time clerk working at the pharmacy, heard someone say, "This is a robbery." The taller of the two intruders, wearing a "cracked leather" coat and scarf worn so only his eyes were visible, carried the gun and did the talking. Responding to orders, Ms. Brandt led the taller robber to three cash registers from

---

[1] At the sentencing proceeding, on June 13, 1975, he was also sentenced to one year for escape, to which he pled nolo contendere. This conviction is not on review.

which he took money. Immediately prior to this interruption, Ms. Brandt had been waiting on W. P.

W. P., a warehouseman, was in the pharmacy to have a roll of picture film developed. He recognized the taller man with the gun as the defendant, first by his voice, then by the way he walked, and finally by a shock of brownish blond hair tied into the scarf. W. P. said he had seen the defendant around town, met him on Main Street and talked to him "quite a few" times, perhaps fifteen or twenty within the previous three or four years. The last time he saw the defendant before the robbery was in the late summer or early fall of 1974 at the Deck Bar.

At the trial, W. P. was steadfast in his certainty of identification. "I have talked to him before and know what his (defendant's) voice sounds like, and that was the voice I heard that evening." The voice was distinctive to W. P. because of "a southern type drawl or accent."

W. P. heard the defendant make several statements, including; "Who can open this register?" "Hurry up or I will kill you" and "Hurry up, let's get going, man."

When the taller man approached the cash register by which W. P. was standing W. P. observed his eyes and hair. This confirmed in his mind that the robber was the defendant. W. P. also recognized the way the man walked, which he described as a shuffle and a swaying of the body.

Oshkosh police officer James Lehndorf was first to respond to the scene. He found a bottle of one and one-half grain Tuinal capsules on the ground.

Gerald Forseth, an Oshkosh police officer, retrieved the jacket of the bullet fired into the pharmacy ceiling by the taller of the robbers.

The police obtained a search warrant to search defendant's home based on the identification of W. P.

Police were admitted to the home by defendant's father, James Chapin. Curious to see if there were drugs or anything else that could help the police, James Chapin participated in the search. In a dresser drawer in a downstairs hallway he found a box of shells which he handed over to the police.

Firearms specialist Ronald Diedericks from the Crime Laboratory Bureau of the Wisconsin Department of Justice testified the fired bullet jacket retrieved from the ceiling of the pharmacy was of the same caliber and type as the bullets contained in the box turned over by Chapin.

Carrie Debehnke, a friend of the defendant, testified the defendant had visited her at her home January 1, 1975, at which time he displayed a pistol.

At 4:00 a.m., January 9, (two days after the robbery), Fond du Lac police officer Mark VandeBerg saw two white males walking north on North Main Street in Fond du Lac. They appeared to be looking for something or watching for someone. The men identified themselves to the officer as the defendant and Robert Schaffer. Because he had been advised that a warrant had been issued for the defendant and that Schaffer was wanted for questioning, both men were taken into custody. At the police station an inventory was taken of the men's possessions. Defendant Chapin had been carrying $524 in currency and $2.18 in change. Mr. Schaffer was carrying $417 in currency and a dime. In addition, Chapin had been carrying seventy-six capsules. Schaffer was also carrying a quantity of capsules. It was stipulated at trial that some of the capsules were not taken during the robbery.

The defense case consisted of four eyewitnesses who were unable to identify the defendant at a police lineup consisting of five subjects dressed and masked like the robber. Allan Halvorsen found nothing distinctive about

the defendant's voice; Trudy Brandt and Mrs. W. P., W. P.'s wife, made misidentifications; Mrs. W. P. testified the robber talked with "jive-type speech, negro talk, real hippie"; Lloyd Runyon noticed the taller robber walked with a "little swagger," but could not make an identification.

Trudy Brandt and W. P. correctly identified Robert Schaffer, the alleged shorter of the two robbers, at another lineup.

The defense sought to impeach the credibility of W. P., the only witness who made a positive identification of the defendant. Defense counsel was allowed to ask whether W. P. had ever been convicted of a crime. Additionally, and over objection, he was allowed to ask if the convictions concerned the issuance of forged checks. W. P. said yes.

Defense counsel also sought to ask W. P. if he had spent time in a mental institution and if so, for what purpose. An offer of proof was made, based on an order of commitment which was entered in July, 1967 and a report by Doctor E. F. Schubert who was the superintendent at the Central State Hospital at Waupun. The offer was that on July 18, 1967, W. P. was committed to the Central State Hospital at Waupun to determine whether or not he was capable of standing trial on several forgery charges and that W. P. was returned able to stand trial but was advised that he should seek psychiatric counselling.

The court asked what this report had to do with the witness's credibility in 1975. Counsel responded, "shows at least one time . . . he was in need of mental help, aid."

Defense counsel also made an offer of proof that on approximately July 11, 1970 the witness was involuntarily committed to Winnebago State Hospital as being in need of treatment for mental disease or defect, due to a suicide attempt, and was detained until September 6, 1970.

The court reviewed the underlying physicians' reports which were the basis of the offers and concluded that:

". . . the court finds nothing in either of these files that have been referred to by the defense in regard to Mr. W. P. that his hospitalization would adversely affect his credibility, and the court is of the opinion that the only utility it could be to the defense would be to prejudice this witness in the eyes of the jurors. Accordingly, the defense will make no reference then to either one of the mental hospitalizations. . . ."

At a hearing on motions after verdict the lower court said the eight year old report of Dr. Schubert:

"in no way indicates that the diagnosis therein contained . . . any reference, even the slightest, to the witness (W. P.'s) capabilities to observe, know what he was seeing and there was no indication in those proceedings . . . as to his powers of observation, his ability to recall, or his credibility as a witness.

"The court considered him competent at this time to testify as a witness but was of the opinion that the witness coming into the court shouldn't have his entire closet skeletons exposed for no particular valuable reason other than what appeared to the court to be the prejudice of this particular witness in the eyes of the jury. The defense made no effort to attack the competency of the witness by calling any of the doctors who examined him either in 1967 or in 1970 when he was processed in the County Court of Winnebago County under Chapter 51, mental proceedings, which is a civil commitment."

The scope of cross-examination allowed for impeachment purposes is within the trial court's discretion. *Champlain v. State,* 53 Wis.2d 751, 757, 193 N.W.2d 868 (1972) ; *State v. Becker,* 51 Wis.2d 659, 667, 188 N.W.2d 449 (1971). In the realm of impeachment, according to one treatise:

"The criteria of relevancy are vague, and the purpose of the cross-examiner is often experimental. Accordingly, too tight a rein upon the cross-examiner may unduly

curb the usefulness of the examination. On the other hand, dangers of undue prejudice to the party or the witness and of waste of time from extended exploration are apparent. Consequently, the trial judge has a recognized discretionary power to control the extent of examination." *McCormick on Evidence,* sec. 30, p. 59 (2d ed. 1972).

A person's capacity to observe an event, recall it and then narrate it at trial may well be affected by his mental condition. In *Sturdevant v. State,* 49 Wis.2d 142, 181 N.W.2d 523, 44 A.L.R.3d 1196 (1970) this court adopted the following rule:

" 'The mental capacity of a witness is proper to be considered as bearing on his credibility. Thus the impaired condition of the mind either from a temporary cause, . . . or other infirmities, is deemed a proper subject of inquiry for the consideration of the jury in determining the credibility of a witness. So it may be shown that the witness has a mind or memory impaired from disease or other cause; but mere mental impairment without more, is not sufficient to affect credibility, . . . Moreover, evidence that a witness was subject to epilepsy does not warrant disregarding his testimony in the absence of a showing as to what effect epilepsy has on the memory.' 98 C.J.S., Witnesses, pp. 326, 327, sec. 461." 49 Wis.2d at 148.

The qualification made above, that mere mental impairment, without more, is not sufficient to affect credibility, is but a specific application of the general rule that while the right of the accused to be confronted by his accusers is guaranteed by the constitution, the cross-examination of even an adverse witness may be limited by considerations of relevance and materiality. *State v. Becker, supra,* 51 Wis.2d at 666.

In addition, the court has discretion to weigh the probative value of evidence against the possibility of

unfair or undue prejudice. Sec. 904.03,[2] Stats., (1973) ; *State v. Johnson*, 74 Wis.2d 26, 42, 245 N.W.2d 687 (1976) ; *Jones (George Michael) v. State*, 70 Wis.2d 41, 54, 233 N.W.2d 430 (1975). The weighing process is not restricted to evidence relating to the issue of guilt or against the accused, but applies to all witnesses. *Edwards v. State*, 49 Wis.2d 105, 109, 181 N.W.2d 383 (1970). This court need not agree with the ruling below if the lower court acted within the bounds of its discretion. *Featherly v. Continental Ins. Co.*, 73 Wis.2d 273, 283, 243 N.W.2d 806 (1976).

In *Desjarlais v. State*, 73 Wis.2d 480, 501, 502, 243 N.W.2d 453 (1976) unspecified allegations of drug use were held an improper area of cross-examination because the reference could impugn the character of the witness without evidence of whether the drug consumption was licit or illicit.

The question in *Barren v. State*, 55 Wis.2d 460, 198 N.W.2d 345 (1972) was whether the trial court improperly restricted the defendant's cross-examination of a witness concerning a drinking problem. This line of questioning was properly restricted, this court held, because the evidence of intoxication was not connected to the time of the incident or the time of testifying; hence it did not bear on the witness' veracity.

"Generally, the character of a witness may be impeached only in regard to matters which go directly to his reputation for truth and veracity. *State v. Eisenberg*, (1970), 48 Wis.2d 364, 378, 180 N.W.2d 529. The fact that a witness was intoxicated, on or about the time of

---

[2] "904.03 *Exclusion Of Relevant Evidence On Grounds Of Prejudice, Confusion, Or Waste Of Time*. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

the happening of the incident he is testifying to, would affect the accuracy and credibility of his testimony. *Pollock v. State*, (1908), 136 Wis. 136, 116 N.W. 851. However, the mere fact a witness upon occasion becomes drunk would not affect his credibility. 3A Wigmore, *Evidence* (Chadbourn rev.), pp. 761, 762, sec. 933, states:

" '. . . Intoxication, if it is of such a degree as to deserve the name, involves a numbing of the faculties so as to affect the capacity to observe, to recollect, or to communicate; and is therefore admissible to impeach:

" ' . . .

" ' . . . But a general habit of intemperance tells us nothing of the witness' testimonial incapacity except as it indicates actual intoxication at the time of the event observed or the time of testifying; and hence, since in its bearing upon moral character it does not involve the veracity trait (§923 *supra*), it will usually not be admissible.' " 55 Wis.2d at 464.

The court concluded, "Although in certain situations, more latitude should be given or cross-examination where the state's case is dependent upon the testimony of a single witness, *State v. Buss*, (1956), 273 Wis. 134, 139, 76 N.W.2d 541, the attempted inquiry must still withstand the test of relevancy and materiality." *Id.* at 465.

In *Johnson v. State*, 75 Wis.2d 344, 360–361, 249 N.W.2d 593 (1977), we said:

"Inquiry into the existence of and treatment for mental affliction is proper where it appears that a connection exists between the affliction and the reliability of the witness's testimony . . . Trial courts possess considerable latitude in determining the proper scope of cross-examination, the matter resting in the sound discretion of the court."

The same principles apply here. Evidence of mental disorder or impairment may be relevant as affecting the credibility of a witness when it shows that his mental

disorganization in some way impaired his capacity to observe the event at the time of its occurrence, to communicate his observation accurately and truthfully at trial, or to maintain a clear recollection of it in the meantime. *Commonwealth v. Butler*, 232 Pa. Super. 283, 331 A.2d 678, 680 (1974).

In this case the tendered proof did not meet any of these criteria. The alleged hospitalizations occurred well before the relevant events of the law suit and did not bear adversely on the witness' capacity to observe or predilection for truth-telling.

Defendant submits that a new trial may produce a different result if unrestricted cross-examination is allowed and therefore a new trial should be granted in the interests of justice. Because exclusion of the irrelevant evidence was not error, defendant is not entitled to a new trial.

*By the Court.*—Judgment and order affirmed.