**James Edward GRAVES, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 36595.**

Court of Criminal Appeals of Texas.

April 8, 1964.

Rehearing Denied June 10, 1964.

Second Motion for Rehearing Denied Oct. 21, 1964.

Peter S. Navarro, Jr., King C. Haynie (on appeal only), J. S. Bailey, Jr., Houston, for appellant.

Frank Briscoe, Dist. Atty., Carl E. F. Dally and Jon N. Hughes, Asst. Dist. Attys., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

The conviction is for murder; the punishment, death.

The deceased, Selmon Phillips, and his wife, were operating a motel on October 5, 1962. While Mrs. Phillips was seated at the telephone switchboard behind the counter, and the deceased was seated nearby, the appellant appeared at the door of the office about 9 p. m. When the deceased asked him inside, the appellant entered, threw a paper sack upon the counter, pulled his pistol, and told Mrs. Phillips to give him every "damn thing you've got under there." The appellant then said to the deceased: "you d—s—o—b—, get behind the counter." As the deceased, who was crippled, tried to comply, the appellant struck him with his pistol, demanded deceased's billfold, and when he reached for it, the appellant shot him four or five times from a distance of two or three feet. After the first shot, the deceased struck appellant with a club, knocking off his hat and glasses, which were left at the scene as appellant fled from the motel, and the police were notified.

Mrs. Phillips testified that she identified the appellant at the police station as the man who shot her husband at the motel. She also testified on cross-examination as follows:

"Q. Did you have by chance an occasion to say anything to him or did he say anything to you at the police station?

"A. Yes, sir.

"Q. Did you say something to him?

"A. No sir. He came in and picked me out.

"Q. How's that? A. He came in and told me he did it and he was sorry *of* it.

"Q. Is that all he told you? A. No sir.

"Q. What else did he tell you?

"A. He said he never had been no good in his life and never would be and his conscience wouldn't let him live with*it*."

"Q. * * *

"A. He said its a life for a life and he would get the chair but he said my conscience wouldn't let me live with it."

A resident living directly behind the motel, about the time in question, heard his dog barking loudly, observed an automobile parked behind the office of the motel, and after hearing three shots saw a car speeding from the scene. The evidence further shows that there were blood spots from the front door of the motel to the place where the car was parked behind the motel and also signs that the car had started up suddenly.

The evidence reveals that a hair found inside the hat band of the hat found on the floor of the motel soon after the shooting, when compared with known specimens of hair from the head of the appellant, shows that they were completely identical, each having the same characteristics.

The appellant was apprehended on November 15, following the shooting of the deceased on October 5, and he thereafter made a written statement which he signed, and in which he admitted robbing the motel and shooting the deceased with a .22 caliber pistol. While accompanying the officers, the appellant pointed out to them the place in a bayou where he had thrown the .22 caliber pistol, and it was recovered as he directed, and it contained five spent shells.

The appellant did not testify in his own behalf before the jury, but in their absence he testified that he did not voluntarily make the written statement; that the statement included certain facts which he did not relate to the officers, that he did not lose his hat and glasses at the motel as shown in the statement. On cross-examination in the absence of the jury he admitted signing the statement; and he testified that the officers recovered the pistol he used at the motel in the bayou by following the directions he gave them. After this testimony the court overruled appellant's motion that the written statement was involuntarily made as a matter of law.

The appellant called as witnesses his aunt, a person who had been reared with him, six fellow prisoners, a psychiatrist, and a juvenile parole officer. Their testimony portrayed a series of acts and conduct beginning when he was a child and continuing to the date of the trial in this case, including five commitments to the reform school in Gatesville, two to the state hospital, and one to the penitentiary. The witnesses described the commission of numerous brutal acts by appellant on members of his family, and stated that he had committed theft and burglary and had been released from the penitentiary about two months before the instant offense was committed; and they further described him as being unstable and abnormal. The psychiatrist stated that he considered appellant mentally sick and dangerous, but no witness expressed the opinion that he was insane.

In rebuttal the state called a psychiatrist, a psychologist, and two probation officers, and they each expressed the opinion that appellant was sane.

In his brief and oral argument, the appellant strenuously insists that the trial court erred in refusing to grant his amended motion for a new trial. In the motion he alleged that the jurors were informed through public media that the appellant was planning to escape, that the life of the district attorney had been threatened, that extra guards were needed and they appeared beside appellant in the court room upon restoration of light after an electrical failure. He further alleged that the state, in its closing argument, referred to the juvenile record and prior convictions of the appellant, and that he was incapable of rehabilitation; that the jury commented on appellant's failure to testify, and did not read and consider the court's charge during their deliberations; and that since the trial he had discovered new testimony which would support his defense of insan-

ity. The failure to attach affidavits of any jurors to the motion is accounted for by a showing of their unwillingness to make affidavits.

In support of his motion the appellant called as witnesses the following five jurors and Bruce Hamilton Kennard:

Juror Wilson testified that after he was selected as a juror, but before the jury was completed: "This is the only thing I did hear. That the District Attorney had been threatened because of this trial"; that he did not recall who made such statement, and that he had not heard or read anything about the case before his voir dire examination.

Juror Williams testified that he never obtained any information from a newspaper or television about this case, but as the members of the jury went to their meal he heard the newsboys saying that a district attorney had been threatened but he did not know which one, and he never heard any comment by a juror about newspaper publicity.

Juror Anderson testified that he never heard of any threats and that he never heard any discussion about the case among the jurors until they retired to deliberate.

Juror Fisher testified that she saw a headline in a newspaper but she did not know "who it was or anything about it."

Juror Dalleo testified that she had not heard anything about this case before her selection as a juror, and that there was no discussion among the jurors of any publicity about the case.

The record is silent as to the failure to call as witnesses the other members of the jury, other than as shown in the following stipulation. It was stipulated that if each juror was called he would testify that he refused to talk with the investigators for the appellant; and "that all twelve of them were instructed that they did not have to talk to me (the state's attorney), they did not have to talk to the De-

fense lawyers or anyone else about what went on in the jury room, and we will further stipulate that they all refused to talk to Defense Counsel when they were asked."

Notwithstanding the stipulations, appellant's investigator Bible testified that Jurors Williams, Anderson, and Fisher were willing to discuss the case with him.

■ The refusal of any or all of the members of the jury, after they had been discharged, to talk with appellant's attorneys or his investigators violated no statute, and under the record does not authorize a reversal as the appellant contends. Farrar v. State, 162 Tex.Cr.R. 136, 277 S. W.2d 114, certiorari denied, 350 U.S. 854, 76 S.Ct. 97, 100 L.Ed. 759.

The testimony of the five jurors does not reveal that any comment was made during their deliberations about the failure of the appellant to testify, or that they did not read and consider the court's charge as alleged in the motion.

■ The complaint referring to the state's closing argument concerning the appellant's juvenile record, his prior convictions, and his being incapable of rehabilitation, when considered in connection with the evidence, shows no error. The evidence introduced by the appellant, and that offered by the state, without objection, shows numerous acts of misconduct since his childhood and that he had had five separate commitments to the reform school in Gatesville, and that he was released from the penitentiary about two months before the instant offense was committed. Further, no objections were made to such argument when it was made.

Appellant insists that the trial court erred in refusing his motion for new trial on the ground of the newly discovered testimony of Bruce Hamilton Kennard.

■ At the hearing, Kennard testified that he had been in jail witth the appellant, and that during his trial someone

from the district attorney's office asked him if he would testify that appellant was not crazy or insane. When Kennard told him he had been assessed a life sentence but the sentence had not been pronounced, Kennard was asked if he would testify for the state, if some deal could be worked out; and that appellant knew nothing about this conversation until he returned to his cell.

Virgil Hart, an investigator for the district attorney's office, testified that at the request of assistant district attorney Ernst he talked with Kennard in jail during the trial, and Kennard told him that he thought the appellant was crazy, and that he reported this information to Ernst. Hart further testified that he never discussed with Kennard anything about his sentence.

It appears that the alleged newly discovered evidence was available to appellant as both Kennard and the appellant had been in the same jail for some time before and during the time of the trial, and such evidence could have been ascertained before the conclusion of the main trial by the exercise of reasonable diligence. Six persons who were or had been fellow prisoners of the appellant testified as to his physical and mental condition. The testimony of Kennard, as shown, was not such as would likely change the result if produced on another trial.

From a consideration of all the evidence offered in support of the motion, it is concluded that the trial court did not abuse his discretion in refusing to grant a new trial.

The evidence is sufficient to support the conviction and no error appearing, the judgment is affirmed.

Opinion approved by the Court.

On Appellant's Motion for Rehearing

McDONALD, Judge.

Appellant in his motion for rehearing again contends that the trial court erred in failing to grant a new trial based on newly discovered evidence elicited from Bruce Hamilton Kennard and that this court erred in not so holding.

While we remain convinced of the soundness of our original opinion in this cause and that the present contention of appellant was properly disposed of therein, we do feel that due to the gravity of the punishment imposed a more thorough discussion of our position will be proper.

The record from appellant's hearing on his motion for new trial reflects that witness Kennard had been questioned by someone from the District Attorney's Office, prior to the main trial of this cause. During this questioning it was elicited from Kennard that he was of the opinion that appellant was "crazy." Kennard was not called to testify during said main trial.

It is contended that this amounted to a deliberate suppression of evidence of appellant's insanity by counsel for the State. Reliance is had upon Ashley v. State, 5 Cir., 319 F.2d 80, in so contending.

We can find no merit in this assertion.

In Ashley, supra, the evidence the United States Court of Appeals for the Fifth Circuit concluded should have been disclosed was that of two doctors who had examined Ashley at the request of the state, and concluded he was insane and had informed the prosecuting officer of this fact.

In the Ashley opinion Judge Tuttle cited United States ex rel. Thompson v. Dye, 3 Cir., 221 F.2d 763, wherein the following is found:

"It seems likely that many situations will arise in which a prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false. But there are other circumstances in which a prosecutor must, or certainly should know that even testimony which he honestly disbelieves is of a type or from a source which in all probability would make it very persuasive to a fair mind-

ed jury. This is notably true of testimony of a police officer, and most certainly of an arresting officer, favorable to a contention of the accused person."

In the case at bar, six persons who were or had been fellow prisoners of appellant testified as to his mental condition, and there is no showing that the testimony of Kennard, also a fellow prisoner, would have varied in any degree from that so elicited. The instant case is easily distinguished from Ashley, supra, as in Ashley, the suppressed evidence was that of two medical doctors appointed by the State to examine the accused while in the case at bar, the evidence was that of an untrained felon who would have testified substantially as had six other fellow prisoners of appellant. Thus Kennard's testimony was not such as " * * * in all probability would be persuasive to a fair minded jury."

Appellant's motion for rehearing is overruled.