Stanley Eugene MEANS, Appellant,

v.

The STATE of Texas, Appellee.

No. 41181.

Court of Criminal Appeals of Texas.

May 22, 1968.

Rehearing Denied July 24, 1968.

Jerald D. Mize, Houston, for appellant.

Carol S. Vance, Dist. Atty., Phyllis Bell and Erwin G. Ernst, Asst. Dist. Attys., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

ONION, Judge.

The offense is Murder with Malice; the punishment, assessed by the jury, ninety-nine (99) years confinement in the Texas Department of Corrections.

Appellant raises three grounds of error: (1) Insufficiency of the evidence to sustain the conviction; (2) Nondisclosure by the State of favorable evidence to the defense; and (3) Improper jury argument.

The State's case rested solely upon circumstantial evidence as there was no eye witness to the brutal crime which appellant was charged with perpetrating.

The record reflects that appellant, twenty-three, met the deceased Sylvia Daniel, apparently a local prostitute, in Albert's Bar, Houston, Texas, which she frequented, on the afternoon of August 26, 1966, where he talked with her and bought her beer. Appellant and the deceased left Albert's Bar at approximately 6:30 p.m. and went to the coffee shop in the DeGeorge Hotel where the deceased created a disturbance when the waitress refused to serve her beer because of her intoxicated condition. As a result of the disturbance they were refused service altogether. The manager-waitress of the coffee shop testified that appellant and the deceased left at approximately 7:40 or 7:50 p.m. and entered the lobby of the DeGeorge Hotel; that shortly thereafter she received from room service the same order appellant and deceased had placed with her earlier.

State's Exhibit #14, a completed registration form for the DeGeorge Hotel, showed that appellant and the deceased registered as Mr. & Mrs. A. W. Means[1] at 7 p.m. and paid in advance for their room. The desk clerk testified that in recording the check-in time that he and the other clerks were not always accurate to the minute.

Wesley Marshall, the 59-year-old DeGeorge Hotel bellhop, testified that he took appellant and the deceased to Room 512 of the hotel between 7:30 and 8:30 p.m., during which time the deceased repeatedly requested shrimp; that at Room 512 he received their order for shrimp and beer and he returned to the room with the order about 10 or 15 minutes later. He related that a man's voice asked him several times to wait "just a minute," and that after about 20 or 25 minutes of knocking and waiting appellant opened the door wearing only his trousers and permitting only sufficient space for the food tray to be passed through.

Garland Brock, the elevator operator for the DeGeorge Hotel, testified that he carried appellant, the deceased, and Wesley Marshall, the bellhop, to the fifth floor of

---

1. A. W. Means was shown to be the name of appellant's father as well as his brother.

the hotel between 7:30 and 8 p.m.; that shortly thereafter he saw the bellhop waiting outside of Room 512 with the tray; that for five times over a period of thirty minutes as he periodically stopped on the fifth floor he observed Wesley Marshall still waiting; and he corroborated Marshall's testimony as to the appellant's dress at the time he opened the door. He further related that approximately one to two hours after appellant's arrival at the hotel he carried appellant to the lobby of the hotel.

The nude body of the deceased was discovered in Room 512 at 3 p.m. the following day by the hotel maid after having the door unlocked. She had been strangled with a lamp cord and a wire clothes hanger and severely beaten around the face. Evidence further showed that the beer and shrimp were left untouched on the tray and appellant's fingerprint was discovered in the room. The Harris County medical examiner placed the time of her death at approximately 8:30 p.m. on August 26, 1966. He described the deceased as a 41-year-old woman with graying reddish brown hair and only two teeth in her head, who was at the time of her death suffering from pulmonary tuberculosis and cirrhosis of the liver. The autopsy conducted further revealed that the deceased had an empty stomach and that she had had sexual intercourse sometime during the day of her death. He further revealed that the alcohol content of her blood at the time of her death was 0.302 per cent which in his opinion was equivalent to having had within an hour or two of death 18 to 24 12-ounce bottles of beer or 18 to 24 1-ounce "shots" of 80 proof whiskey.

The appellant did not testify in his own behalf. The only testimony he offered was that of a former investigator with the Houston Police Department who testified that as a result of a test that he conducted with State's Exhibit #19 (a ring bearing the initial "M," which was discovered in Room 512), he found it would not fit any of the appellant's fingers except his smallest two.

To meet the State's circumstantial evidence case the appellant sought to show that there were other men registered in the De-George Hotel, and other available entrances and exits than by the lobby and elevator, reflecting ample opportunity for another person or persons to have committed the murder without detection, particularly given the proclivities of the deceased.

■ The court charged the jury upon the law of circumstantial evidence. In viewing the evidence presented in the light most favorable to the jury's verdict, we are convinced that the evidence is sufficient to sustain that verdict, and further that the trial court did not err in refusing appellant's motion for instructed verdict.

As has been said, "[s]ome circumstantial evidence is very strong, as when you find a trout in the milk." Henry D. Thoreau, Journal, November 11, 1850. Ground of error #1 is overruled.

The facts surrounding the nondisclosure or alleged suppression of facts by the State were elicited at the motion for new trial. As will be observed, the case here presented does not fit the normal pattern of cases of alleged suppression of evidence.

It appears that prior to trial the entire State's file was handed physically to both of appellant's court appointed counsel. Such action obviated any necessity for pre-trial motions for discovery. In fact, some of the material therein could not have been reached by means of discovery. See Article 39.14, Vernon's Ann.C.C.P. During the trial each request of appellant's counsel to inspect various items in the State's file was granted and the State voluntarily displayed or offered for inspection such items. In said State's file was a police report showing that at the time of the discovery of the deceased's body some loose hairs had been found on her nude body. Some two or three weeks prior to trial the State attempted to secure from the appellant while he was confined in jail head and pubic hair samples in order that they might be compared with hairs found at the scene

of the crime. The appellant refused to give such samples. On the fourth day of the trial the court, at the request of the State and over the vigorous objection of appellant's counsel, ordered that the appellant submit samples of his pubic and chest hairs for comparisons with like hairs found at the scene of the crime. Said samples were taken from the appellant at approximately 5:30 p.m. on that day. On the following day, Friday, January 27, 1967, at the noon recess appellant's counsel conferred with the assistant district attorney prosecuting in order to determine how many more witnesses the State expected to call before resting in order that he might have his lone witness available when necessary. During such conversation appellant's counsel inquired if the State's attorney had heard from the chemist with regards to the result of the test of the comparison of the hairs. The prosecutor replied in the negative but indicated that he would check since he could not recall whether he was to call the chemist or the chemist was to call him.

The State's chemist, Peter Christian, testified that on the afternoon of Friday, January 27, he informed the State's attorney who was prosecuting the case that the results of his test showed that the three unidentified hairs found on the body of the deceased did not match the hairs of either the deceased or of the appellant.

The prosecutor testified that he had, in fact, received the results of said test from the chemist sometime during the noon recess and thereafter he discussed with his co-counsel whether the State was obligated to bring such testimony before the jury. Concluding that it was not, he returned to the courtroom and recalled one witness[2] and then rested. He explained that he did not call the results to appellant's counsel's attention possibly because of the stress and strain of trial. The court's docket sheet reflects that the trial resumed at 1:25 p.m., that both sides closed at 2:30 p.m. and that jury arguments began at 2:45 p.m.

Robert Tutt, a newsreporter for the Houston Chronicle, testified that when the State rested its case on Friday, January 27, without having called the chemist or indicating the results of the test ordered the day before he approached the prosecutor at the water cooler in the courtroom and inquired of him if the test had been completed and if he had learned the results thereof. He stated that the prosecutor related to him that the test showed that the hairs found on the deceased's body did not belong to her or to the appellant. He testified that his story to this effect appeared in the last edition of the Houston Chronicle on January 27.

Appellant's counsel testified that after his inquiry during the noon hour with the prosecutor, he assumed in view of the complete cooperation he had had from the State up to that point that he would be informed if the results of the test became known and concluded that when the State rested without offering such evidence or informing him of the results of the test that the chemist had not had sufficient time to complete the test. As to when he learned of the results of the test appellant's counsel testified as follows:

"The first time I learned of the results of the test was either by reading it in the Houston Chronicle or having a discussion in the judge's office about the story in the Houston Chronicle * * *."

Such testimony does not reveal the exact time that appellant learned of such evidence. The record does teach us, however, that the jury retired to deliberate at 3:58 p.m. on Friday, January 27. The court's docket sheet shows that on Saturday, January 28, 1967, the verdict of the jury was received. The verdict of the jury is shown to have been filed by the clerk of the court at 11:10 a.m. on January 28, 1967.

The relatively recent development of the prosecutor's constitutional duty to disclose

2. Police Officer James A. Pierce was recalled to remove by his testimony an additional fire escape erected on the DeGeorge Hotel solely by cross-examination.

evidence favorable to the accused began in 1935 with Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, and has continued to develop. Certain guidelines and rules have emerged.

■ Certainly, we now know, reversal must follow where the prosecutor deliberately presents a false picture of the facts by knowingly using perjured testimony. Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690; Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791.

■ Reversal must also follow if the prosecutor presents a false picture of the facts by failing to correct its own testimony when it becomes apparent that it was false. Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737; Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9.

■ Further, we note that a conviction must be reversed if the prosecutor actively suppresses evidence which may exonerate the accused or be of material importance to the defense. Jackson v. Wainwright, 5 Cir., 390 F.2d 288; Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; United States ex rel. Almeida v. Baldi, 195 F.2d 815, 33 A.L.R.2d 1407, Cert. denied, 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341; Curran v. State of Delaware, 3 Cir., 259 F.2d 707, Cert. denied, 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353. See Goldstein, "The State and the Accused: Balance of Advantage in Criminal Procedure," 69 Yale L.J. 1149 (1960).

■ Reversible error is also committed where the prosecutor negligently or inadvertently fails to disclose evidence which may exonerate the accused or which may be of material importance to the defense, even though not offered as testimony at the trial and even though the accused's counsel is not diligent in his preparation for trial. United States ex rel. Meers v. Wilkins, 2 Cir., 326 F.2d 135; Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287; United States v. Poole, 7 Cir., 379 F.2d 645; Barbee v. Warden, 4 Cir., 331 F.2d 842; Ashley v. State of Texas, 319 F.2d 80, Cert. denied 375 U.S. 931, 84 S.Ct. 331, 11 L.Ed.2d 263; See also Thomas v. United States, 9 Cir., 343 F.2d 49; "Disclosure of Prosecutor's Evidence—Disclosure of Favorable and Material Evidence Required Although Procurable by Diligent Defense Counsel," 42 N.Y.U. Law Rev. 764; "Prosecutor's Failure to Disclose Evidence Equally Available to the Defense May Constitute a Violation of Due Process," 42 Notre Dame Lawyer 264.

The standard applied in such cases has been whether the testimony "may have had an effect on the outcome of the trial." Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217.

The development of the case law on this subject teaches that the good or bad faith of the prosecutor or the lack of diligence by the defense counsel or the lack of request for such information (particularly where defense counsel has no reason to suspect the existence of such evidence) are not the controlling factors they may have once been.

In Barbee v. Warden, 4 Cir., 331 F.2d 842, it was said: "In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel."

In Jackson v. Wainwright, 390 F.2d 288, the Fifth Circuit Court of Appeals said:

"In Brady v. State of Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 the Court made it clear that its primary interest was not to punish misconduct by the prosecutor, but to insure a fair trial to the defendant, and particularly to insure that the trial would bring out, not hide, the truth. Before *Brady* the Court seemed to have placed some

weight on the willfullness of the prosecutor's action, but in *Brady* the Court said:

" 'We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material [either] to guilt or to punishment, *irrespective of the good* [faith] *or bad* faith of the prosecution.' 373 U.S. at 87, 83 S.Ct. at 1196 (emphasis added).

"In accord with *Brady* lower federal courts have emphasized the harm to the defendant rather than the prosecutor's motive in failing to disclose exculpatory evidence."

Whether or not the prosecutor in a criminal case must disclose all evidence in his possession favorable to the accused to comply with due process depends on many factors, and a case by case judgment must often be made. It seems likely that many situations will arise in which the prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false.[3] But there are other circumstances in which a prosecutor must, or certainly should know that even testimony which he honestly disbelieves is of a type or from a source which in all probability would make it very persuasive to a fair minded jury. Graves v. State, Tex.Cr. App., 382 S.W.2d 486; United States ex rel. Thompson v. Dye, 3 Cir., 221 F.2d 763.

■ In the case at bar, the State takes the position that in addition to having made the appellant aware of the discovery of loose hairs, the delay in the test itself resulted from appellant's actions and objections and that the results of the test were inconclusive and were not sufficiently exculpatory, probative or material so as to require disclosure to the defense. Be that as it may, there can be little doubt that simple fairness required that the prosecutor should have disclosed the results of the test to the accused. The question remains, however, whether the failure to disclose, under the circumstances here presented, calls for reversal.

The findings of the unidentified hairs on the body of the deceased may have been consistent with the theory advanced by the defense that someone could have possibly entered the hotel room after appellant left, but such findings do not undeniably support the defensive theory in view of the undisputed fact of the deceased's avocation and the fact that the deceased did not meet the appellant until 6:30 p. m. on the day in question, approximately 2 hours prior to the estimated time of her death. Further, such findings were not inconsistent with prosecution's theory of the case.

We cannot conclude that the evidence allegedly suppressed would have materially affected the determination of appellant's guilt or the punishment to be imposed and that the failure to disclose such evidence, under the circumstances here presented, was so prejudicial as to warrant a reversal on the basis of denial of due process.

There are other grounds to support sustaining the conviction. We cannot conclude that appellant has shown he did not know the results of this test prior to the receipt of the jury verdict. It appears that prior to the receipt of the jury's verdict that the results of the test by virtue of newspaper coverage was a matter of some public knowledge in Harris County and if having learned of such test the appellant could have moved the court to allow him

---

3. Justice Fortas in his concurring opinion in Giles v. State of Maryland, supra, when discussing his views as to when the State was required to disclose evidence to the accused stated:
"This is not to say that convictions ought to be reversed on the ground that information merely repetitious, cumulative, or embellishing of facts otherwise known to the defense or presented to the court, or without importance to the defense for purposes of the preparation of the case for trial was not disclosed to defense counsel. It is not to say that the State has an obligation to communicate preliminary, challenged, or speculative information."

to reopen in order to introduce other testimony. See Article 36.16, V.A.C.C.P. We find no evidence in the record that the appellant made such request.

If appellant's counsel, of course, actually knew the facts which were withheld, appellant cannot now seek relief on the basis of the State's failure to disclose the same facts. See Thomas v. United States, 343 F.2d 49 at pp. 54–55, 9th Cir., 1965; United States ex rel. Thompson v. Dye, 221 F.2d 763 at p. 767, 3rd Cir., Cert. denied, 350 U.S. 875, 76 S.Ct. 120, 100 L.Ed. 773. Therefore, even if we were to conclude that the actions of the State's attorney constituted suppression of the evidence, which may have had an effect on the outcome of the trial, still reversible error is not shown in view of the fact that appellant has failed to show that he did not know the results of the test involved before the receipt of the jury verdict at this one stage trial.[4]

We are aware of the recent decision in Hamric v. Bailey, 4 Cir., 386 F.2d 390, holding that the eventual disclosure of evidence favorable to the accused after the jury has retired comes too late. The Fourth Circuit Court of Appeals interpreted Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, as requiring disclosure, at least, before the taking of the accused's evidence is complete. Even if we could agree with that interpretation of Brady,

under the circumstances here presented, we feel that Hamric can be distinguished from the case at bar on the facts[5] and on what we deem was the real basis for the reversal in Hamric. The laboratory report in Hamric was in the State's possession prior to trial, was inconsistent with the prosecution's theory, was not inconclusive but unquestionably supported the self defense theory offered by the accused. There was no showing that the accused ever tried to prevent such tests nor was she apparently aware that such laboratory reports were available until their discovery. Such were not the facts in the case at bar.

Further, and most important, we conclude that the real basis for the court's decision in Hamric was the knowing use of false and misleading evidence. Two witnesses for the State had been allowed to testify that they had observed no particles of glass or wood on the decedent's shirt in spite of the fact that the prosecution had in its possession the laboratory report indicating just the opposite. The court found these facts and the result analogous to Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690. Such was not the case at bar. Ground of error #2 is overruled.

While the State is to be commended for opening their files to appellant's court appointed counsel in this most serious case, this writer fails to see what purpose could

---

4. This case was tried prior to the 1967 amendment of Article 37.07, V.A.C.C.P., effective August 28, 1967. Prior to such amendment the one stage trial in capital cases where the State was seeking the death penalty as here, was specifically approved in Rojas v. State, Tex.Cr.App., 404 S.W.2d 30 and Williams v. State, Tex. Cr.App., 415 S.W.2d 917.

5. In Hamric the decedent was killed by a shotgun blast while standing somewhere outside a window of the female defendant's house. She admitted having fired the gun through the window that killed the victim, but contended that he was just outside her window at the time and was attempting to get into her house. Her defense, then, was self defense and the

exact position of the decedent at the time he was felled by the blast was critical to her case. The State, on the other hand, advanced the theory that the decedent was on his own property at the time he was killed, at least ten feet from the defendant's house. Not until the jury had retired did the defendant discover that the prosecution had in its possession a laboratory report indicating that the decedent's shirt had contained particles of glass and wood, facts which undeniably would have supported her defense of self defense by showing that the decedent must have been standing just outside of the defendant's window at the time he was shot. Such evidence was material and favorable to the defendant's case.

possibly have been served by the State's attorney's failure to bring the results of the test to the attention of the appellant's counsel, particularly in view of his argument that the results of the test were inconclusive as to appellant's guilt or innocence since the testimony indicated that the deceased was a practicing member of the world's oldest profession and apparently was also married to or living with a man in a Houston hotel (other than the De-George). His actions only endangered the conviction acquired and overlooked the provisions of Article 2.01,[6] V.A.C.C.P. While it may not necessarily be required, it would certainly seem to be a more desirable practice for the trial judge when ordering tests or examinations, either at the request of the State or the defendant or on his own motion, to direct that the results of the test or examination be reported immediately to him so he might take such action as then deemed appropriate. Such handling of the matter probably would have avoided the question here raised. If the judge had revealed the results of the tests to both parties, the prosecutor would have been relieved of any fear that any unnecessary action on his part alone would jeopardize the State's case, and the defense counsel would have been relieved of any concern that another inquiry on his part about the tests would result in the production of additional evidence bolstering the State's case.

In ground of error #3 appellant complains of seven instances of improper jury argument. In two of such instances we find that the appellant's objection was immediately sustained and the court on its own motion instructed the jury to disregard such argument. Thereafter no further relief was requested by the appellant. In the other five instances we find that there was no objection, no request for instruction, no motion for mistrial, and having considered such statements in the context in which they were made and in light of the entire record, we cannot conclude that error is shown. Ground of error #3 is overruled.

Finding no reversible error, the judgment is affirmed.

---

6. See Article XIII, Sec. 3(5), Canons of Ethics, State Bar Rules; see also Canon 5, American Bar Association Canons of Professional Ethics.