Charles Edward COMPTON, Appellant,

v.

The STATE of Texas, Appellee.

No. 46406.

Court of Criminal Appeals of Texas.

Sept. 25, 1973.

Rehearing Denied Oct. 24, 1973.

Butts & Butts, San Antonio, for appellant.

Ted Butler, Dist. Atty., Charles Conaway, John L. Quinlan, III, Richard D.

Woods, Asst. Dist. Attys., San Antonio, Jim D. Vollers, State's Atty., and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

The appeal is taken from a conviction for the offense of murder with malice. Trial was before a jury; punishment was assessed by the court at 20 years' confinement.

In his voluminous brief, appellant enumerates some 35 grounds of error, many of which overlap.

The critical evidence presented is as follows: On the night of February 20, 1971, appellant went into the "We-No-Tell Club" in San Antonio.[1] A short while later, the deceased entered the lounge. According to the night manager of the club, he called appellant a stool pigeon—he threatened to "blow his (appellant's) brains out" if he kept on "snitching." The confrontation did not go beyond the verbal exchange and the appellant soon left the club.

When the club closed for the night, the night manager and several other persons, including the deceased, started walking out the door. Appellant was observed leaning against an outside wall, holding a gun. The deceased was behind the club manager; appellant motioned for her to get off the stairs. When she did, appellant began cursing the deceased and told him to put his hands up. He then ordered the deceased to remove his jacket and then to take his shirt out of his trousers. The deceased begged for his life, repeatedly telling appellant he had no gun. Appellant then shot him. The deceased lunged for appellant, and several more shots were fired. Appellant then fled the scene.

Another employee of the lounge also testified that upon exiting the club she observed appellant ouside, holding a gun. She then turned around and went back inside the club. From there, she heard shots, four or five of them.

A customer at the club witnessed the shooting and recited substantially the same facts as did the club manager.

A medical examiner stated that two bullets were recovered from the deceased's body and that there were four or five entrance wounds. An examination of the deceased's body by police officers soon after the shooting failed to uncover any weapon on the deceased.

Appellant testified in his own behalf. His version of the night's events coincided with the testimony of the State's witnesses, up to a point. He admitted that after he left the club the first time he went in search for a gun. Appellant stated he then went back to the lounge "to try to have some kind of understanding" with the deceased. Appellant waited outside the club until the deceased emerged. According to appellant, the deceased cursed him and told him they had nothing to talk about. Then the deceased rushed him, knocked him against the front of an automobile and appellant's gun then discharged. Appellant stated that the other shots were also fired while scuffling. He testified he did not intend for the gun to go off—that it went off accidentally.

■ The first of appellant's contentions relates to the trial court's denial of appellant's second motion for continuance. Appellant was arraigned on May 13, 1971. On June 24, 1971, a pretrial hearing was held. Appellant's first motion for continuance, based upon missing witnesses, was heard on August 2, 1971; the motion was granted and the case was reset for October 4, 1971. On that date, appellant again

1. The night manager of the club testified that upon entering the club appellant apologized to her for not being around for her birthday; but he told her he now had a present for her—some "Black Mollies" (amphetamines).

moved for a continuance, alleging that he was suffering from stomach and gall bladder trouble and was not able to adequately assist his counsel in the preparation of his trial. The trial judge denied this second motion for continuance.

During the course of this trial, appellant testified at length in his own behalf. Both at the actual trial and at the hearing on his motion for a new trial, he referred to his "stomach trouble." In his brief, appellant states that he has suffered from some trouble for some 15 years.

The trial judge was in a far better position than this Court to judge the appellant's physical and mental condition and his ability to stand trial and assist in his own defense. Our only resort, in determining whether there has been an abuse of discretion, is to examine the cold record. We have done that; each of the nearly 1200 pages has been read. Our conclusion is that appellant was sufficiently able to relate to the jury his defense, such as it was. If the record reflects any "confusion" on appellant's part while testifying, it appears to emanate from his hesitancy to give the prosecutor a direct answer as to whether or not he deliberately pulled the trigger of the gun which killed the deceased. The record is void of any delay or requested delay during the trial due to appellant's ailment. Further, appellant's seasoned attorney had more than sufficient time to prepare for trial and he represented appellant well. Though the trial judge might have been justified in granting the motion, there is nothing to indicate that he abused his discretion in overruling it. Moore v. State, 144 Tex.Cr.R. 145, 161 S.W.2d 83 (Tex.Cr.App.1942); cf. Graham v. State, 72 Tex.Cr.R. 9, 160 S.W. 714 (Tex.Cr.App.1913) and Reid v. State, 138 Tex.Cr.R. 34, 133 S.W.2d 979 (Tex.Cr.App.1939).

Appellant next argues that the trial court erred in requiring defense counsel to relinquish his privately owned transcript of the examining trial. The record supports appellant's contention that he engaged the services of a private court reporter to take down the testimony presented at the examining trial. No official court reporter was present. Before the actual trial, the State requested a copy of the transcription of this testimony. After a hearing on the matter, the court ordered the defense to comply with this request. Appellant had argued that "the obligation is and was upon the County to pay a Court Reporter out of the General Fund . . . . ." The fact is that the trial judge ordered that defense counsel be reimbursed out of the General Fund in the amount of $218.00, which was what it cost to hire the court reporter.[2]

The fact situation presented is certainly unusual. We must agree with appellant that it is not his duty or responsibility to provide a court reporter for both his own use and the State's. But we fail to perceive any *harm* incurred by the present accused. The State had available a tape recording of the examining trial testimony which it could have had transcribed. The difference between doing that and what was actually done—obtaining a copy from appellant and reimbursing him—appears minimal at best. We decline to reverse this cause on such a ground.

Appellant also contends that he should have been granted a charge on aggravated assault. No authorities are cited. As earlier stated, appellant's defense was that the gun he was carrying "accidentally" discharged, at least four or five times, killing the deceased. No evidence was presented which supports the requested charge. As stated in Rice v. State, 156 Tex.Cr.R. 366, 242 S.W.2d 394 (Tex.Cr.App.1951), the appellant having testified, he made his own defensive theory and is bound thereby.

2. The court ordered that defense counsel be paid $62.40 if a *copy* of the examining trial testimony was filed, as opposed to the original. The decision as to which one should be filed was left to the discretion of the defense counsel.

Another ground relates to references to an "extraneous offense." As previously mentioned (see footnote #1), a State's witness, Opal Webber, testified that she was night manager of the "We-No-Tell" lounge on the night of the shooting. She stated that she had recently had a birthday; when appellant came into the lounge, he told her that he had a birthday present for her and that it was "real different." The following colloquy then occurred:

"Q [Prosecutor] All right. Now did he—what was your birthday present?

"A Some Black Mollies.

"Q Some what?

"A Black Mollies.

"Q What is a Black Mollie?

"A An amphetamine, a pill.

"Q Now, did he give you your birthday present?

"A Yes.

"Q How many of these Black Mollies did he give you?

"A Two."

■ Defense counsel objected at this point. It is this reference to the pills which appellant labels as an inadmissible extraneous offense. Without reaching the merits of such a contention, we overrule appellant's ground. To begin with, the quoted material above reflects that only after four references to the pills did defense counsel object. An objection must be made as soon as the ground of objection becomes apparent, e. g., Sierra v. State, 482 S.W.2d 259 (Tex.Cr.App.1972). Also, when appellant testified in his own behalf his own counsel examined him extensively regarding any "birthday presents"; appellant denied that he had "any pills, Black Mollies, amphetamines, or anything like that" with him that night.

This writer has found in the record at least two other occasions where the "Black Mollies" were referred to by the State, without objection. See White v. State, 486 S.W.2d 377 (Tex.Cr.App.1972). No error is shown.

■ Several of the remaining contentions raise the point that appellant was denied a fair trial because of the prosecution's attempts to link him to "gangland" activities in San Antonio; also, appellant claims the prosecutor committed reversible error in labeling him a "con man" or gangster and referring to his unemployment.

We have examined the record, including the prosecutor's argument. The fact is that such conclusions are reasonable deductions from the evidence presented during the trial. For example, one eyewitness to the shooting stated that before the shooting the deceased appellant shouted:

"you m———— f————, you think you are bad and I kill m———— f————s bigger than you are, and you think you are a gangster, but I'm the gangster and I've killed plenty more."

Two other witnesses stated that appellant told the deceased that he was not the first person he had killed and probably wouldn't be the last. Appellant himself testified that he understood there was a "contract" out to have him disposed of.

When appellant testified on direct examination, one of the first incidents he related was an argument he had with the deceased while gambling. In relating the episode, appellant referred to the dice used in the game as "baloneys" or "what we call ace, trey, fives." On cross-examination appellant testified that he was unemployed at present (October, 1971), and had been so since 1969. The prosecutor then inquired:

"Q As a matter of fact, you are a professional gambler, isn't that the truth?

"A I beg your pardon, sir. I refer to it as the gaming business.

"Q    All right. Okay, we'll refer to it as the gaming business. You are in the gaming business. All right. You are in the professional gaming business, isn't that right?

"A    You could call it that, sir.

"Q    Well, what do you call it?

"A    Gaming business is the term."

Upon cross-examination of appellant regarding the argument with the deceased over the dice, the following occurred:

"Q    [Prosecutor] All right. He (the deceased) made nine straight passes before you picked up the dice and figured out they were baloney dice; is that your story, and you a professional gambler?

"A    Yes, sir."

No objection was voiced by defense counsel. Nor may he now be heard to complain of the prosecutor's argument along the very same line.

Appellant's contention of jury misconduct relates to their discussion of the appellant's livelihood, the "Black Mollies" incident and other matters already in evidence. Appellant has not shown that any new evidence was received or discussed by the jury. Bartell v. State, 464 S.W.2d 863 (Tex.Cr.App.1971); Art. 40.03, Vernon's Ann.C.C.P.

■    One of appellant's remaining contentions charges that he should have been granted a new trial, in light of newly discovered evidence brought to the trial court's attention. Appellant vigorously argues that reversible error was committed when the State deliberately failed to inform the defense of State's witness James Watts' criminal record. He contends that the prosecutor advised defense counsel only

that Watts had a 1924 felony conviction. The prosecutors involved in this cause testified at the hearing on the motion on newly discovered evidence that they *had* shown defense counsel Watts' "rap" sheets and that he had declined copies of them.

Watts' testimony at trial was that on the night of, but prior to the shooting, appellant came to his room in the hotel where they both lived. Watts testified that appellant came to him to "try and borrow a heavy weapon."

Appellant's own testimony, on direct examination, was that on the night in question he sought out Watts because he was "in search for a hand gun." Appellant stated that, though he attempted to do so, he was not able to obtain a pistol from Watts.

Watts was not a witness to the shooting. Even if his testimony had not been heard, substantially the very same facts were placed into evidence by appellant himself.

"We cannot conclude that the evidence allegedly suppressed would have materially affected the determination of appellant's guilt or the punishment to be imposed . . . ." Means v. State, 429 S.W.2d 490 (Tex.Cr.App.1968).

There were two eyewitnesses to the shooting who testified at the trial. The deprivation, if any, of the opportunity to attack the credibility of a non-critical witness such as Watts would not warrant a reversal of this case. Cf. Martin v. State, 491 S.W.2d 928 (Tex.Cr.App.1973).

Appellant's remaining contentions, many of which are multifarious and overlap grounds previously discussed, have been examined; we find no reversible error.

The judgment is affirmed.