Jefferson Lawrence WHITE, Appellant,

v.

The STATE of Texas, State.

No. 2–83–003–CR.

Court of Appeals of Texas,
Fort Worth.

Aug. 31, 1983.

Rehearing Denied Oct. 5, 1983.

William H. Kincaid, Bowie, for appellant.

Jack A. McGaughey, Dist. Atty., Montague, for the State.

Before FENDER, C.J., and ASHWORTH and BURDOCK, JJ.

## OPINION

BURDOCK, Justice.

Appellant, Jefferson Lawrence White, was convicted by a jury of aggravated assault. Tex.Penal Code Ann. § 22.02 (Vernon Supp.1982). That jury assessed punishment at five (5) years, probated.

We affirm the conviction.

White alleges in four grounds of error that the trial court erred in: (1) failing to grant his motion for new trial, based upon the failure of one of the jurors to truthfully answer material questions at voir dire; (2) overruling his motion for discovery concerning State records reflecting all those persons who were present inside the Bowie Police Station during the altercation forming the basis for the offense; (3) requiring him to stand trial notwithstanding the fact that several of the witnesses subpoenaed by White had not yet been served, and although White did not give an unqualified answer of "ready"; and, (4) refusing to allow the defense to disclose to the jury the fact that appellant's father, Paul White, who was also involved in the struggle forming the basis of the offense, died in the Montague County Jail later in the day; and also in refusing to allow a pathologist to testify that it was within the bounds of reasonable medical probability for the totality of the injuries suffered by Paul White to have occurred as a result of being kicked, struck, and beaten in a fight wherein the participants used force and violence.

Essentially, this case reflects a "swearing match" between members of the Bowie Police Department and the defense. The jury apparently chose to give credence to police witnesses rather than to the defense. During the early morning hours of May 23, 1982, appellant and his father, Paul White, went to the Bowie Police Station seeking to regain possession of Paul White's watch. Sergeant Richison informed Paul White that the watch could not be returned as yet, as it was being held as evidence regarding a complaint which had been filed with the police. Apparently Paul White then became verbally abusive, and Richison ordered him to leave the station. The appellant then joined into the argument, at which time Officer John Byork also ordered both Whites to leave the station. When the Whites refused to leave, Byork placed appellant under arrest for disorderly conduct. Byork then grabbed appellant's arm, pursuant to the arrest and appellant responded by swinging his fist at Byork. The punch was ineffective and Byork was able to get appellant in a headlock. Both men then fell to the floor, and Byork attempted to handcuff the appellant.

Appellant's father, Paul White, then attempted to intervene on behalf of his son, although he had been ordered by Richison to stay away. There is conflict in the evidence concerning whether Richison pushed or hit Paul White.

During the melee, private citizens David St. John, Ronald Read, and Shannon Strange entered the station, and at Richison's request, intervened in the struggle on the side of the police officers. These citizens had been involved in an altercation with the Whites earlier in the evening, which resulted in their possession of Paul White's watch. Apparently, they had come to the station to turn over this watch to the police and had encountered the Whites in the police parking lot, informing them of the fact that the police now had the watch. Both Whites were subdued and "booked" into jail.

Paul White died in the Montague County Jail later that same day. Dr. M.F.G. Gilliland testified for the defense. She stated that she examined Paul White and found that he had sustained three (3) broken ribs, a cracked voice box, various lacerations and a large bruise under the surface of the scalp. Gilliland was permitted to state that Paul White's injuries were consistent with having been kicked and beaten, and that these injuries occurred on May 23rd, but she was prevented from testifying that Paul White died in jail, or that the injuries received during the struggle at the police station were the cause of his death.

Police witnesses disputed appellant's testimony that his father was kicked and that his head was slammed against the wall and floor. The police witnesses stated that they used only normal and minimal force to subdue both Whites, and that no excessive force was necessary.

Appellant's first ground of error alleges that the trial court erred in failing to grant him a new trial. This contention arises out of the events of voir dire of the jury panel, during which defense counsel asked the panel the following question:

Now, I anticipate that a large portion of the testimony that you are going to be hearing is likely to be coming from persons who are employed by the Bowie Police Department or some other law enforcement agency?[sic] Now, would the fact that this person very likely is going to be appearing in uniform, or irrespective of that fact, would the fact that they are a police officer cause any of you to believe their testimony more than what you would some other witness? Anyone?
. . .

As a part of appellant's motion for new trial, an affidavit of juror Thelma Fuller was presented to the trial court's attention. This affidavit states that Fuller did not answer counsel's question truthfully. The affidavit, in relevant part, states:

I have always trusted and believed in law enforcement officers, and think that I can trust them more than most other people, and I think I can believe their sworn testimony more than that of a person who is not a peace officer. I therefore found it impossible to believe that a police officer could do some of the things that were claimed to have been done by the Bowie Police in the Jeff White trial.

Counsel did not present other evidence at the hearing upon his motion. Counsel did argue the merits of his motion to the court. Although appellant did not offer the affidavit of Juror Fuller into evidence, the court took judicial notice of all papers on file. We note that an affidavit concerning juror misconduct which is attached to a pleading becomes part of that pleading. The affidavit is not evidence in itself. In order to constitute evidence the affidavit must be introduced as such at the hearing upon the motion for new trial. *See Boone v. State,* 629 S.W.2d 786, 789–90 (Tex.App.—Houston [14th Dist.] 1981) and *Stephenson v. State,* 494 S.W.2d 900, 909–10 (Tex.Cr.App.1973). No testimony was offered or heard at the hearing. Specifically, Fuller did not testify. No reasons were offered to the court, such as the death or unavailability of Fuller, from which the court could have properly ruled that her affidavit constituted evidence. Therefore, the requirements of TEX.CODE CRIM.PROC.ANN. art. 40.03 (Vernon 1979) were not met by appellant, and the alleged error has not been preserved for our review. Ground of error one is overruled.

In his second ground of error, appellant alleges that the trial court erred in denying him a list of the names and addresses of all persons present within the Montague County Jail on the night of May 22–23, 1983. This request, pursuant to a motion for discovery, included not only names of those city employees present, but also those persons who were prisoners within the jail on the night in question. The State takes the position that no error was committed as the State did release to defense counsel the names of all those persons whom the State intended to call as witnesses at trial, as well as all information in the State's possession which might have been exculpatory, in full compliance with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

We seldom hear discovery questions on appeal. Many jurisdictions within the Second Supreme Judicial District have adopted an open file policy, which effectively eliminates most such issues on appeal. We endorse and recommend this policy, as the State should be, and is, as interested in the pursuit of justice as is defense counsel, and should be readily willing to release to counsel any and all potentially exculpatory materials in its possession.

Appellant insists that his request for discovery was made, not as a "fishing expedition", but rather as "an attempt to discover the identities of witnesses who may have seen or heard something which would have helped the jurors to determine who were really the aggressors ..." There can be no question that the requested information was in the possession of the State, since the jail and police station records were in the control of police agencies. The testimony at trial established that all relevant events which form the basis for the offense occurred within a hallway in front of the dispatcher's office of the police station, not in a cell block area. Appellant did not offer evidence that this hallway is within the view of persons who might have been in the cell block area, although evidence was adduced from which it could be argued that prisoners might have heard the noise of the struggle and voices of the participants.

Appellant did not show that he had attempted to secure the relevant police records by subpoena of their custodian(s), or in any other way inform the trial court that material to which he had been denied discovery existed *and* was material to his defense. *See Smith v. State,* 516 S.W.2d 415 (Tex.Cr.App.1974); *Turpin v. State,* 606 S.W.2d 907, 915 (Tex.Cr.App.1980); and *Thomas v. State,* 482 S.W.2d 218 (Tex.Cr.App.1972). Mere assertions by the appellant that prisoners must have been present in the jail, and may have seen or heard things which could be exculpatory or bear upon the credibility of prosecution witnesses, are insufficient to establish that this was indeed the case and therefore that the trial court should order production of the sought after jail records. Appellant has not shown a particularized need for the items requested. *See Hinkle v. State,* 442 S.W.2d 728, 733 (Tex.Cr.App.1969) and *Solomon v. State,* 467 S.W.2d 422 (Tex.Cr.App.1971). Appellant also did not request an in camera inspection of the State files to determine if such evidence existed. Furthermore, appellant's brief asserts that defense counsel *knew* the names of certain persons who were present in the jail that night. While this information is outside the record, we note that if the information sought of the State by way of a discovery order is known to an appellant, he cannot claim injury on appeal because he has been denied discovery of such information. *Means v. State,* 429 S.W.2d 490, 496 (Tex.Cr.App.1968). We hold that the trial court acted properly in refusing appellant's requested discovery order (in part), and we overrule ground of error two.

Appellant's third ground of error states that the trial court erred in requiring him to stand trial, even though several of the witnesses subpoenaed by the defense were never served, and even though he did not give an unqualified answer of "ready" at the commencement of the trial. The court denied appellant's motion for continuance, which urged, inter alia, that the State had not yet produced the list (subject of ground of error two) requested in defendant's mo-

tion for discovery. Since we have ruled that this "list" was not properly shown to be required of the State, the portion of ground of error three concerning it is overruled. The rest of the argument supporting this ground of error complains that several key witnesses were unavailable as of the date of trial, and therefore, that the trial court erred in failing to grant appellant's motion for continuance.

■■■■ The State urges that we should overrule this assertion because of appellant's lack of diligence in requesting that the missing witnesses be subpoenaed. The record does not support this contention, as the appellant subpoenaed these witnesses on October 21st and 22nd, whereas trial was on the 27th. We cannot agree with the State that counsel was not diligent in securing the complained of witnesses. However,

> [t]his Court is not authorized to reverse a conviction for failure to grant a continuance unless the record shows that the evidence sought to be secured by the delay was material to the case and that appellant was prejudiced by the inability to produce it. [Citations omitted.] For that reason it is required that when complaint is made of the denial of a motion for a continuance to secure evidence, an affidavit or other evidence be presented on the motion for new trial showing the nature and materiality of the missing evidence....

*Leach v. State*, 548 S.W.2d 383, 384–85 (Tex.Cr.App.1977). Appellant's motion for new trial does not show the nature and materiality of the missing witness testimony. Ground of error three is overruled.

Appellant's fourth ground of error is based upon two rulings by the trial court in favor of the State: (1) preventing the defense from informing the jury that Paul White died in the Montague County Jail on May 23rd (possibly as a result of injuries received there); and, (2) preventing Dr. M.F.G. Gilliland, a pathologist, from testifying that it was within the bounds of reasonable medical probability for the totality of the injuries suffered by Paul White to have occurred as a result of being kicked, struck,

and beaten in a fight wherein the participants used force and violence. Gilliland did testify concerning the injuries suffered by Paul White. Although mention was made of the fact that she was a pathologist, and that a pathologist examines "bodies and tissues to see what effects disease or injuries have on people . . .", the jury was then removed for an extensive hearing concerning the extent to which she would be permitted to testify, and it is doubtful that the jury realized that the examination of Paul White which Gilliland testified about was in fact an autopsy. Gilliland testified before the jury as follows:

> A There were several injuries to his face. This included a bruise over his eyebrow, and another bruise beside his eyebrow; a scrape on his cheek; a bruise on his upper lip on the right side; and a bruise on the inner-side surface of his lower lip. He also had a crusted tear on his forehead just above his left eyebrown. He had some internal bruising on the surface of the scalp—I am sorry, on the scalp, not on the surface; and on the right side of the back of his head behind his ear.
>
> Besides that, he had some bruises on his chest on the right side next to the nipple; a line of bruises, and then another line of bruises lower down at the edge of the rib cage. He had three broken ribs in that area at about the level of the nipple. He also had some bruises on the left side of his chest. There were other bruises and scrapes on the back of his hip on the right side where the bone is felt under the skin. Those were the injuries on the chest.
>
> Now, between the head and the chest is the neck, and on the neck there was a small bruising on the—in the tissue over the voice box, and there was a little crack in a small part of the voice box; not the voice box itself, but a little part of it that sticks out slightly to the side. The little crack had some bleeding next to it.
>
> On his arms there were bruises on the right arm between the shoulder and the elbow on the outside of his arm and on the inside closer to the body. There was

another small bruise on the right arm near the elbow. There were redish bruises on the right arm near the wrist, made a little bit of a line, and then there were some scrapes on his fingers, on the middle finger and on the index finger. He also had a scrape on the left arm near the wrist.

He had bruises on both of his knees. He had a bruise on the right shin near the ankle, and a bruise on the left ankle, with a scrape—with both a bruise and a scrape in the same area.

There were no broken bones in his arms or his legs or fingers or hands.

\*　　\*　　\*　　\*　　\*　　\*

A   The kind of injury that would cause the injuries, the damage to the head, is what is called a blunt force injury. That either means a blunt object strikes the head, or the head strikes a blunt object, such as the floor, the wall; the blunt object that the head hits, a desk, a fairly flat surface. The only tearing was a fairly small one over the eyebrow. That could be a little bit more of an edge, such as the edge of a table or the edge of a door frame. The other possibilities are blunt instruments, blunt objects, fairly broad surface objects, which could include a large number of objects.

Q   Now, this cut that he had on his forehead above his eye, was it a fairly deep cut, or was it just merely superficial?

A   It was—it did not extend to the bone, but it was—the skin in that area is about between a quarter and a half an inch in thickness, and it was about half way between the skin surface and the bone, and so that is—It is also an area that bleeds freely when it is torn, and so it was an injury that probably bled freely earlier. It was crusted, or had begun to heal by the time I saw it.

Q   But it was a fairly deep wound?

A   Yes.

Q   Now, did he have any cuts or lacerations on his chest?

A   No.   Those—the injuries to the chest were bruises and the breaking of the three ribs.

Q   Okay.   And so the injuries actually were underneath the skin, the subsurface?

A   Yes.

Q   What would cause—what type of force would be necessary to break three human ribs of the type that were broken here?

A   At least a moderate force; several kinds of injuries, that include falling against an edge from your own height with your own weight is sufficient, particularly if you are walking along and don't just quietly collapse; or running, that would do it. Forces produced by another person could cause such an injury. A blow with the hand, or a blow with the heel of the hand, or the elbow, or the knee, or the foot; any of those instruments would produce this kind of injury that does not have much damage on the surface of the skin, but does have an internal injury in the ribs being broken.

Q   Would a kick to the ribs suffice?

A   Yes, it would.

Q   You mentioned an injury to the voice box area, or a crack up there along the voice box.

A   Yes.

Q   What type of force would be necessary to do that?

A   That is also a blunt force injury. It can be a fairly quick blow. It doesn't have to be a long blow, or a compressing blow, but that is another kind of injury. That is less clear what kind of an injury. Either a kick or a chop or a punch could do that. Also, the other kind of injury, though, is a squeezing kind of an injury.

Q   Would it have to be a fairly substantial squeeze?

A   Yes.

Q   It would have to be more than just simply a light or moderate squeeze or force?

A   Yes.   That is very hard to judge, though, what is light or moderate, in the squeeze injury.

Q   Would it be more likely for it to be done with a fairly heavy squeeze, or a

head-hold, or something of this nature, or would it be more logical for it to be done from a kick or a hit, or would they both be fairly logical?

A They would both be fairly—they would both leave the same injury, and there was not any more injury to distinguish between the two.

\* \* \* \* \* \*

Q Now, I realize that we are talking about a large number of different injuries which, taken individually, might be caused by almost anything?

A Yes.

Q But taking all of these different injuries that you have testified to, or that you have noted, as a whole, would it be within the bounds of reasonable medical probability for the injuries that you described to be caused without anybody ever kicking Paul White, without ever hitting him with hard or severe blows, as a wall or floor, or without striking such a person with a blunt object? If you didn't have any of those causations, and taking all the injuries as a whole, would it be within reasonable medical probability for these injuries to have occurred?

MR. MCGAUGHEY: Objection, Your Honor. That question is greatly multifarious.

THE COURT: Sustained.

■ Appellant takes the position that Dr. Gilliland should have been permitted to testify in answer to the above question because: (1) prosecution witnesses had testified that both Whites had been "handled" with the same amount of "necessary minimum force", and should it be shown that Paul White had received his injuries as a result of being kicked, beaten, or struck by officers, then appellant's defense that he merely protected himself from excessive force being used upon him would have been established; and, (2) in a case such as this wherein police testimony is diametrically opposed to that of the defense, the jury should have been permitted to know that Paul White died (arguably) as a result of injuries received at the hands of the same officers who testified against the appellant, and therefore, that these officers had strong motivations to lie to the jury in order to "cover up" what had occurred in the Bowie Police Station on the night in question.

The State argues that the prohibited testimony was not material to any issue in the case, and was therefore properly excluded. We agree. The appellant was charged with aggravated assault. Under the facts of this case, the alleged assault either did or did not take place at the moment during which Officer Byork placed appellant under arrest and appellant struck Byork with his fist. The jury heard testimony from which it could rationally find each and every element of the offense. Subsequent events, involving the continued escalation of the struggle between the Whites and officers and others at the Bowie Police Station are not relevant to the determination of whether appellant struck Byork with his fist at the outset of the altercation. Assuming, as the jury found, that appellant did strike Byork with his fist at the outset of the struggle, we find no evidence from which a jury could have concluded that appellant struck Byork only to protect himself from excessive force being used upon appellant, or another, *at that point in time.* Ground of error four is overruled.

We affirm.